THE COUNTY OF COOK, d/b/a Cermak Health Services, Petitioner, v. LICENSED PRACTICAL NURSES ASSOCIATION OF ILLINOIS, DIVISION I, *et al.*, Respondents.

First District (3rd Division)  No. 1—94—0602

Opinion filed September 30, 1996.

Jack O'Malley, State's Attorney, of Chicago (Karen A. Covy, John J. Murphy, and LaVerne Rolle Saunders, Assistant State's Attorneys, of counsel), for petitioner.

Sally A. Stix, of Madison, Wisconsin, for respondent Licensed Practical Nurses Association.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Daniel N. Malato, Assistant Attorney General, of counsel), for respondent Illinois Local Labor Relations Board.

JUSTICE GREIMAN delivered the opinion of the court:
Petitioner County of Cook, d/b/a Cermak Health Services (County), appeals the administrative decision of respondent Illinois Local Labor Relations Board (Board) that found the County had violated the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 1992)) by (1) unilaterally implementing post-employment drug testing without collective bargaining and (2) failing to sign the 1990-93 collective bargaining agreement until seven months after the

parties had come to agreement. For all the reasons that follow, we affirm the Board's decision.

On March 26, 1992, respondent Licensed Practical Nurses Association of Illinois, Division I (LPNAI), filed an unfair labor practice charge with the Board alleging that the County engaged in unfair labor practices (1) by requiring two members of LPNAI to submit to a drug test before being allowed to return to work from medical leaves of absence and (2) by failing to execute the new collective bargaining agreement.

As to the first charge, LPNAI alleged that on November 19, 1991, Bertha Farmer, an employee at Cermak Health Services, "was required to submit to a drug screen before she was allowed to return to work from a medical leave of absence." Similarly, on January 6, 1992, Barbara Davis, another employee at Cermak Health Services, was also required to submit to a drug test before returning to work from a medical leave of absence. Neither employee had any history of drug abuse or disciplinary problems associated with substance abuse.

The charge also stated that during the fall of 1991, the County and LPNAI entered negotiations for a new collective bargaining agreement. During the course of negotiations, the County proposed to include the following language: "The County reserves the right to introduce pre-employment and post-employment drug testing. Details of any such program shall be discussed with the Union." The County, however, withdrew the proposal on November 4, 1991, *i.e.*, prior to the drug tests imposed upon Bertha Farmer (November 19, 1991) and Barbara Davis (January 6, 1992).

As to the second charge, LPNAI stated that a tentative agreement was reached between the County and LPNAI on November 22, 1991. After the County drafted and sent to LPNAI a memorandum of agreement, LPNAI signed the memorandum on December 20, 1991. LPNAI made several requests of the County to execute the memorandum, but at the time of the filing of the complaint (March 26, 1992), the County had failed to execute the written agreement that had been negotiated and agreed upon by the parties. The record reveals that the County did not sign the agreement until July 7, 1992.

By its charge, LPNAI asked that the County be ordered to cease and desist the drug testing of bargaining unit members without cause and to execute the memorandum of agreement.

In its charge, LPNAI alleged unfair labor practices under subsections 10(a)(1) and 10(a)(4) of the Act (5 ILCS 315/10(a)(1), (a)(4) (West 1992)), which provide:

"(a) It shall be an unfair labor practice for an employer or its agents:

(1) to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act or to dominate or interfere with the formation, existence or administration of any labor organization or contribute financial or other support to it; provided, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

\* \* \*

(4) to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit, including, but not limited to, the discussing of grievances with the exclusive representative."

Following an investigation, the Board issued a complaint for hearing on January 8, 1993. The Board recited the allegations made by LPNAI in its unfair labor practice charge, notified the County to respond and announced that a hearing would be conducted. In addition to the subsections on which LPNAI relied, the Board, in its complaint for hearing, alleged that the County violated subsection 10(a)(7) of the Act for its delay in signing the collective bargaining agreement. Subsection 10(a)(7) provides that it is an unfair labor practice for an employer

"(7) to refuse to reduce a collective bargaining agreement to writing or to refuse to sign such agreement." 5 ILCS 315/10(a)(7) (West 1992).

On May 11, 1993, a hearing was held before Sharon Wells, an administrative law judge (ALJ). Three witnesses testified on behalf of LPNAI: Sally Stix, counsel for LPNAI; Bertha Farmer and Barbara Davis. The County presented three of its employees as witnesses: Steven Klem, the assistant director of personnel and later the deputy chief of the bureau of human resources; Helen Maignon, a laboratory technician who performs drug screens; and John Kalchbrenner, the deputy chief of human resources.

Both Bertha Farmer and Barbara Davis were employed at Cermak Health Services, which is a health facility for detainees at the Cook County jail and is located in a building within the County's Department of Corrections complex. When employees of Cermak Health Services enter the building, they must pass through security and are searched for contraband and drugs.

Farmer was first employed at Cermak Health Services in December 1981 and was required to submit a urine sample when she was hired. After an extended medical leave from October until mid-November 1991, Farmer went to the County building to be processed

to return to work in accordance with the policy for employees who had been off work over five days. Prior to resuming her job, Farmer was required to provide a urine specimen in the presence of a security officer for purposes of drug testing. No drug testing was required when Farmer returned to work after four previous extended medical leaves of absence from work in 1985 (July to December), 1986 (September to November), 1988 (June to July), and 1989 (August to December). Farmer testified that she never had a substance abuse problem and had never been in a substance abuse program. Moreover, Farmer had never been accused of having a substance abuse problem and had never been disciplined for having a substance abuse problem.

After working at the University of Illinois Hospital for 22 years, Barbara Davis became employed at Cermak Health Services in March 1990. From October 2, 1991, until January 6, 1992, Davis was on a leave of absence due to the death of her son. Upon returning from leave, Davis was required to provide a urine specimen for purposes of a drug screen test. Prior to her leave commencing in October 1991, Davis had been absent from work about two weeks and was not required to give a urine specimen to return to work. Davis testified that she did not have a substance abuse problem and had never been in a substance abuse program. Davis had never been accused of having a substance abuse problem and had never been disciplined for having a substance abuse problem.

Sally Stix was the chief spokesperson for LPNAI in the Cook County negotiations during the summer and fall of 1991. During these negotiations, the County proposed the following new clause: "Drug Testing: The County reserves the right to introduce pre-employment and post-employment drug testing. Details of any such program shall be discussed with the Union." The parties never discussed the substance of the proposal and the County withdrew it on November 4, 1991.

On November 22, 1991, the final negotiating session, Farmer, a member of the negotiating team for LPNAI, mentioned to Stix that she had been required to submit a urine sample to return to work. Stix, in turn, asked one of the County's negotiators, John Kalchbrenner, about the drug test. Kalchbrenner said he did not know and directed Stix to Steve Klem, who was not a member of the negotiating team. Klem was the County's assistant director of personnel at that time and later became the deputy chief of the bureau of human resources.

Stix testified that during the final negotiations on November 22, 1991, she did not do anything else about Farmer's incident because

the County had already withdrawn its drug testing proposal. Further, she intended to investigate whether drug testing was being done contrary to the collective bargaining agreement. Negotiations were concluding and she did not wish to impede finalizing the agreement, which was already a year past the expiration of the last agreement, before she had done an investigation. Later, Stix requested and received from Klem a copy of the County's policy regarding drug testing.

On behalf of the County, Steven Klem testified that in 1986 or 1987 he helped to write the drug testing policy enunciated in a three-page written document entitled "Procedures For Using EMIT Drug Detection System To Test Public Sector Job Applicants And Employees For Drug Use In Cook County." The policy addressed preemployment drug testing of job applicants and post-employment testing only based on probable cause. The policy expressly provides:

"B. Urine testing of employees will be conducted only under the following circumstances:

* When an employee has been identified by observation, absenteeism, health problems, accidents, or by other means, as having job performance problems that related to substance abuse.

* As part of a routine testing program of an employee returning to work with a history of illicit drug use or legal drug abuse. Such testing will not be used for the purpose of harassing or intimidating the employee.

* When an employee is found in possession of illicit drugs.

* As part of a routine urine testing program instituted as a result of prior disciplinary proceedings against the employee, related to the use or abuse of drugs."

In his testimony, Klem described the above policy regarding employees as "probable cause and reasonable suspicion type testing." Klem further testified that in mid-1990, a change in policy was formulated for employees who had been absent for more than 30 days for any cause. The "policy determination was made by the chief elected official and the chief administrative officer in the County of Cook at that time." The policy requiring the drug testing of employees returning to work after taking a leave more than 30 days was never written any place and no notification of its implementation was provided to any labor organizations.

Helene Maignon, a laboratory technician employed by the County, has been collecting and testing the urine specimens for drug testing since 1987 pursuant to the County's written policy as to job applicants and employees where sufficient cause is established to test

them. Sometime in 1989 or 1990 or 1991, the drug testing policy changed to include employees who went off the payroll for 30 days.

John Kalchbrenner has been employed by the County as deputy chief of human resources since December 1, 1992. Prior to his current position, Kalchbrenner performed virtually the same duties as the director of the position classification agency. Kalchbrenner negotiates with many labor unions. During 1991, Kalchbrenner negotiated contracts with about 24 unions for the 1990-93 time period. Kalchbrenner and two members of his staff worked on preparing all of the contracts. The agreement would be drafted and then the draft would be submitted to the various unions for review. Once the final draft was approved, signed and returned from the union, the contract would be submitted to the Board of Commissioners for their approval. The Board met twice a month, *i.e.*, the first and third Monday of each month. After securing the Board's approval, the contract then would go to the president of the Cook County Board for his signature. Kalchbrenner estimated that the process took five or six months into the year due to the volume and continuing negotiations with other unions.

The collective bargaining agreement between the County and LP-NAI commenced December 1, 1987, and expired November 30, 1990. The 1987-90 agreement remained in effect pending negotiations for a successor agreement and contained no language concerning post-employment drug testing. The term of the successor agreement ran from December 1, 1990, to November 30, 1993.

On September 8, 1993, the ALJ issued her recommended decision and order. The ALJ found that the County had violated the Act as alleged and specifically issued the following conclusions of law:

"1. [The County] unilaterally implemented post-employment drug testing of members of the Unit, returning from leaves of greater than 30 days duration, without bargaining with [LPNAI] over the decision and the impact of the decision, in violation of Section[s] 10(a)(4) and [(a)](1) of the Act.

2. [The County] refused to sign the collective bargaining agreement by failing to execute it for over seven months in violation of Section[s] 10(a)(7), 10(a)(4), and 10(a)(1) of the Act."

On October 27, 1993, the County filed with the Board exceptions to the ALJ's recommended decision and order.

On January 19, 1994, the Board issued its decision and order that upheld the ALJ's decision with one exception. The Board found that the County did not violate section 10(a)(7) of the Act because the County did not refuse to sign the collective bargaining agreement. Instead, the seven-month delay in signing the agreement constituted

bargaining in bad faith and violated sections 10(a)(1) and 10(a)(4) of the Act.

On appeal the County first asserts that the drug testing program is a matter of inherent managerial policy and, therefore, is not a subject of mandatory collective bargaining under the Act. In the alternative, the County contends that if this court should find that the drug testing is a subject of mandatory bargaining, the County's interest in drug testing outweighs LPNAI's interest in bargaining. The County argues that drug testing of employees who have been absent more than 30 days is necessary because the County has not had the opportunity to observe them for such length of time and has a legitimate interest in knowing whether these employees have changed their lifestyle in a manner that could breach the security and safety of the jail. The County observes that LPNAI members come into direct contact with inmates on a daily basis.

■ Judicial review of the Board's decision is governed by the Administrative Review Law. 5 ILCS 315/9(i) (West 1992). Although our review extends to all questions of law and fact presented by the entire record before the court, the findings and conclusions of the Board on questions of fact must considered to be *prima facie* true and correct. 735 ILCS 5/3—110 (West 1992). Our duty is not to reweigh the evidence but rather our function is to ascertain whether or not the findings and conclusion are against the manifest weight of the evidence. *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184 (1992); *Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31*, 229 Ill. App. 3d 180, 185 (1992).

■ When the issue on appeal is purely legal, such as statutory construction, the interpretation given by the administrative agency should receive deference because it flows from its experience, but our review is *de novo*. *Thomas M. Madden & Co. v. Department of Revenue*, 272 Ill. App. 3d 212, 215 (1995). Notwithstanding our independent review, we accord substantial weight and deference to the interpretation of a statute by the agency charged with the administration and enforcement of that statute. *Central City Education Ass'n, IEA/NEA v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 510 (1992); *City of Decatur v. American Federation of State, County & Municipal Employees, Local 268*, 122 Ill. 2d 353, 361 (1988); *County of Cook v. Illinois Local Labor Relations Board*, 266 Ill. App. 3d 53, 57 (1994). Accordingly, an agency's interpretation of a statute should only be overturned if it is clearly erroneous. *O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill..App. 3d 108, 111 (1992).

■ Sections 7 and 4 of the Act govern the issue of mandatory

bargaining. Section 7 places a duty on a public employer "to bargain collectively" and "to negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by Section 4 of this Act." 5 ILCS 315/7 (West 1992).

Section 4 provides that an employer "not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees." 5 ILCS 315/4 (West 1992). Section 4 further provides that an employer must "bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact." 5 ILCS 315/4 (West 1992).

Where an issue affects both inherent managerial policy and conditions of employment, a hybrid situation occurs and a balancing test must be used to weigh "the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority." *Central City*, 149 Ill. 2d at 523; see *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 274 Ill. App. 3d 327 (1995) (applying the balancing test, the court held that a decision to lay off employees was a mandatory subject of bargaining); *Village of Franklin Park v. Illinois State Labor Relations Board*, 265 Ill. App. 3d 997 (1994) (mandatory subjects of bargaining included certain procedures and criteria for promotions).

■ To determine whether or not a given issue is a mandatory subject of bargaining, the Illinois Supreme Court formulated a three-part test in *Central City*:

"The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. This is a question that the IELRB is uniquely qualified to answer, given its experience and understanding of bargaining in education labor relations. If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.

If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then the hybrid situation discussed in section 4 exists: the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment.

At this point in the analysis, the IELRB should balance the benefits that bargaining will have on the decisionmaking process

with the burdens that bargaining imposes on the employer's authority. Which issues are mandatory, and which are not, will be very fact-specific questions, which the IELRB is eminently qualified to resolve." *Central City*, 149 Ill. 2d at 523.

As to the first part of the *Central City* test, the County contends in its brief that its "drug testing policy does not involve matters relating to employment under section 7 of the Act." Such contention defies the record and logic. The undisputed evidence reveals that unless an employee returning to work from a leave of absence submits to a drug test, the employee may not return to work and could be subject to discipline or termination. It is difficult to imagine a more obvious condition of employment.

Moreover, drug testing in employment has been recognized as a condition of employment by the National Labor Relations Board. In state labor cases, the rulings of the National Labor Relations Board (NLRB) are considered persuasive authority for similar provisions in the state Act. *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 190 Ill. App. 3d 259, 264 (1989). The Office of General Counsel for the National Labor Relations Board issued a memorandum to address all cases involving drug and alcohol testing and specifically advised as follows:

> "In response to a growing national concern over drug abuse and drugs in the workplace, some employers have decided to implement drug tests for their employees. In many drug testing programs, employees who refuse to submit to a test may be subject to discipline, including discharge, while employees who submit to the test and have positive results may be suspended and/or required to participate in rehabilitation programs, forced to accept a change in job duties, or subjected to discipline up to and including discharge. Thus, mandatory drug testing literally is a 'condition of employment.'" *Guideline Memorandum Concerning Drug or Alcohol Testing of Employees*, GC—87—5, National Labor Relations Board, Office of General Counsel (September 8, 1987).

Thereafter, the NLRB has found that the unilateral implementation by the employer of drug testing certain employees constituted unfair labor practices. *E.g., Kysor/Cadillac*, 307 N.L.R.B. 598, 603 (1992) ("[b]y unilaterally implementing a policy and practice of requiring certain unit employees to undergo drug testing as a condition of employment, without prior notice to or affording the Union an opportunity to bargain concerning such practice, and by discharging [two employees] pursuant to such policy and practice, the Company has engaged, and is engaging in unfair labor practices"); *Coastal Chemical Co.*, 304 N.L.R.B. 556, 568 (1991) (by "unilaterally instituting and implementing a requirement that employees who require

treatment for job related injuries must undergo a drug test the Company refused to bargain collectively with the Union").

The second part of the *Central City* test asks whether the matter is also one of inherent managerial authority. Drug testing policies can fall within the parameters of inherent managerial authority as evidenced in the present case by certain drug testing policies that are not in dispute. LPNAI has not objected to the County's policies that require the drug testing of job applicants and employees where there is probable cause or a reasonable suspicion that the employee is using or abusing drugs. Moreover, the Board observed that Cermak Health Services is a part of the Cook County jail and recognized that the County has the inherent managerial authority to institute rules and regulations, such as drug testing of employees, to maintain security within the jail by preventing drug trafficking and its attendant problems.

■ We believe that both the Board and the ALJ properly advanced to the third part of the *Central City* test to balance the competing interests of the LPNAI members and the County to determine whether the particular drug testing at issue here should be subject to mandatory bargaining. Furthermore, we find persuasive the Board's prior decision in *City of Chicago (AFSCME Council 31)*, 9 Pub. Employee Rep. (Ill.) par. 3001, Nos. L—CA—91—088, L—CA—92—058 (November 24, 1992), which held that a random drug testing policy unilaterally imposed by the City of Chicago for certain civilian employees violated the Act and the decision and the impact of the random drug testing policy are mandatory subjects of bargaining. The dispute in *City of Chicago* arose when the city unilaterally instituted random drug testing of certain civilian employees of the Chicago police department who were employed in the police department's crime laboratory and evidence and recovered property section, where they performed various duties in connection with the testing and storage of criminal evidence, including narcotics. The city asserted that the drug testing was necessary due to the employees' access to drug samples in the course of their duties, which posed a threat to the security and integrity of evidence essential to the successful prosecution of crimes.

The Board acknowledged that the preservation of the integrity of narcotics evidence is critical to the law enforcement mission. The Board, however, found that no evidence credibly linked the city's security concerns to its decision to impose random drug testing on the employees. The Board observed that the city made virtually no showing of drug use among such employees, much less breaches of security or job performance. Not one instance was presented where such

employee had been accused of tampering with or removing drug samples. In addition, the Board found that there was no indication that less intrusive measures, including suspicion-based drug testing, were inadequate to satisfy the city's concerns.

Similarly, in the present case, we agree with the Board's findings that the County "failed to establish any link between its policy of screening for drug use all licensed practical nurses returning to work after leaves of more than 30 days, and the security needs of the jail." In addition, there was no evidence that nurses returning from leave of more than 30 days ever tested positive, were more prone to the use of illegal drugs, or exhibited security breaches or risks. Further, as in *City of Chicago*, the County offered no explanation as to why the suspicion-based drug testing, to which LPNAI acquiesced, did not fulfill the needs of the County's mission to prevent drugs from entering the facility.

■ The County next asserts that the delay in the ratification of the agreement did not violate the Act because the County diligently placed the agreement on the County Board's agenda and LPNAI suffered no harm and no loss of benefits.

The Board held that the County's delay in executing the 1990-93 collective bargaining agreement was in bad faith and, thus, violated sections 10(a)(4) and 10(a)(1) of the Act because the delay was extreme, no extenuating circumstances existed and the County failed to contemporaneously explain the delay to LPNAI. The Board found that the County's delay in executing the agreement "caused confusion and uncertainty in the bargaining unit."

In the present case, the County and LPNAI agreed to the terms of the collective bargaining agreement on November 22, 1991. The County then drafted the agreement and sent it to LPNAI, which signed and returned the agreement on December 20, 1991. On several subsequent occasions, LPNAI requested the County to execute the agreement. In March 1992, LPNAI filed its charge against the County and expressly alleged an unfair labor practice because the County had still not signed the agreement. Notwithstanding LPNAI's requests and the charge filed by LPNAI in March, the County did not sign the agreement until July 7, 1992, approximately seven months after the terms of the agreement had been decided and LPNAI signed the agreement.

Minor delays accompanied by extenuating circumstances do not constitute unfair labor practices. See *Chief Judge of the Circuit Court of Cook County*, 8 Pub. Employee Rep. (Ill.) par. 2044, No. S—CA—91—63 (ISLRB September 9, 1992); *Cook County Hospital*, 4 Pub. Employee Rep. (Ill.) par. 3022, No. L—CA—88—95 (ILLRB July 14, 1988).

The Board found the delay in the present case was extreme, unexplained at the time, and caused confusion and uncertainty in the bargaining unit. We agree with the Board's finding.

Affirmed.

TULLY, P.J., and GALLAGHER, J., concur.