SIXTH DIVISION
September 30, 2010

No. 1-09-1597

| | |
|---|---|
| THORNTON FRACTIONAL HIGH SCHOOL DISTRICT NO. 215, COOK COUNTY, ILLINOIS, | ) Petition for Review of Opinion ) and Order of the Illinois ) Educational Labor Relations |
| Petitioner, | ) Review Board ) |
| v. | ) ) ) No. 2008 CA 0003 C |
| ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD, and SOUTHWEST SUBURBAN FEDERATION OF TEACHERS LOCAL 943, IFT-AFT, AFL-CIO, | ) ) ) |
| Respondent. | ) |

JUSTICE CAHILL delivered the opinion of the court:

Petitioner Thornton Fractional High School District No. 215 (District) appeals the decision of the Illinois Educational Labor Relations Board (IELRB) to affirm an administrative law judge's (ALJ) recommended decision and order. The ALJ found the District violated sections 14(a)(5) and 14(a)(1) of the Illinois Educational Labor Relations Act (Act) (115 ILCS 5/1 *et seq.* (West 2006)). The ALJ held that the District changed the hiring policy in the guidance office at Thornton Fractional South High School (Thornton South) without notice or negotiation with the Southwest Suburban Federation of Teachers, Local 943, IFT-AFT, AFL-CIO (Union). The ALJ also found the District violated sections 14(a)(3) and 14(a)(1) of the Act when it refused to give Carmen Mureiko a 12-month position as the most senior secretary. On appeal, the District contends that (1) the IELRB's findings are clearly erroneous; (2) the ALJ was biased against the District; and (3) the "traditional make-whole" remedy announced by the ALJ is improper. We

reverse.

The executive director of the IELRB investigated the Union charge and issued an unfair labor practice complaint on December 7, 2007. The complaint alleged that the District violated the Act by discriminating "in regard to the *** terms and conditions of employment," discouraging union membership and failing to bargain collectively and in good faith with the union. 115 ILCS 5/14(a)(3), (a)(5) (West 2006).

A hearing was held before the ALJ on September 24-25, 2008. Carmen Mureiko testified that she started working at Thornton South on June 17, 1997. Sometime in 1999 she began working in the registrar position. In February 2005, District superintendent Robert Wilhite announced that at the start of the 2005-06 school year, in an attempt to reduce a major budget deficit, "all 12-month building secretaries will be reduced to 10.5 months except the principal secretary and the senior guidance secretary."

Wilhite testified that his decision was not intended to establish a course of dealing with regard to employee hiring. He denied that schedule reductions were made based on seniority. Assistant superintendent Dr. Timothy Kilrea corroborated Dr. Wilhite's testimony. Kilrea said that the decision of who would stay as a 12-month employee depended on the "skill set that they bring to help in an office that was going to be absent of support in the summer months." Kilrea never heard anyone make an oral or written representation to District staff that anyone cut from a 12-month position "would have first call on a 12-month job that opened."

The record before the ALJ established that the guidance offices at Thornton South and Thornton North each have three secretarial positions: a registrar, a secretary to the assistant

principal of pupil services and a guidance department secretary. Mureiko testified that Thornton South principal John Hallberg told the secretaries at Thornton South that the most senior employee in the guidance department, Kim Nichols, would remain a 12-month employee. Glenda Beard, the most senior employee in the guidance office at Thornton Fractional North High School, was also selected to keep a 12-month schedule. Mureiko was one of the secretaries whose 12-month schedule was reduced to 10.5 months.

In spring 2006, the 12-month position of administrative assistant/secretary to the assistant superintendent became vacant. Mureiko applied for the job but was not selected. At that time she was not involved in union activities. She did not protest or complain to the District administrator that she was entitled to the job because of her seniority or because she had previously been cut to a 10.5-month schedule.

In February 2006, certain clerical employees of the District met with the Union, decided on representation by the Union and selected officers. Mureiko became the vice president and grievance officer.

In October 2006, District and Union representatives met to discuss the scope of negotiations. Among the Union negotiators were Mureiko, Union president Patricia Seibel and Illinois Federation of Teachers (IFT) staff member Emilie Junge. The District negotiators included superintendent Wilhite, assistant superintendent Dr. Kilrea, District Board of Education president Debbie Waitekus and attorneys for the District.

In February 2007, Mureiko addressed a bargaining session about the need to increase the hours worked by the clerical staff and cited examples of problems she believed stemmed from the

1-09-1597

reduction in hours for clerical employees. Mureiko testified before the ALJ that District board president Waitekus told her to be "careful what she wished for" and superintendent Wilhite told her "to be careful" about her comments.

Dr. Wilhite testified that he told Mureiko "she should be careful about allegations that she's making because we need to have substantiation to those allegations. But that was mostly out of concern for [Mureiko] because I wanted to make sure she didn't get into trouble." Dr. Wilhite also testified that he never heard comments from District board members about Mureiko's future employment and did not discuss her candidacy for a guidance office position at Thornton South. Dr. Wilhite never "visited any benefit or detriment of office on [Mureiko] in any way because of her union activity."

Dr. Kilrea testified that he investigated the problems Mureiko had alleged and found them to be unfounded. He never heard the board members or anyone else express derogatory opinions about Mureiko or say that it was "time to get rid of her" or that she should be retaliated against. He testified that the 12-month employee was selected based on the "the skill set" the employee could bring to the office during the summer months.

In May 2007, the position of secretary to the assistant principal for pupil services in the guidance office at Thornton South became vacant and Mureiko applied for the job. The vacancy posting did not specify whether it was a 10.5-month or 12-month position. Union president Seibel testified that she asked assistant superintendent Kilrea if the position was a 12-month or a 10.5-month position. Seibel said Kilrea responded that it would depend on the seniority of the person selected for the job.

4

Mureiko testified that in early June she was told by her supervisor, assistant principal Dale Pietranczyk, that whether or not she was selected to fill the position she would still be assigned a 12-month schedule. Mureiko was interviewed for the position, but Kim Taylor, who was less senior than Mureiko by more than two years, was selected. Mureiko continued to be employed on a 10.5-month basis.

When Mureiko found out she was not selected for the position, she asked Pietranczyk to clarify whether she would be assigned to a 10.5- or 12-month schedule. Pietranczyk said he did not know. He advised Mureiko to talk to principal Hallberg. Hallberg told Mureiko he did not know but said he would contact assistant superintendent Kilrea. When Mureiko did not hear anything from Kilrea, she contacted Union president Seibel. Kim Taylor was subsequently employed on a 12-month basis, while Mureiko continued to be employed on a 10.5-month basis.

Union president Seibel testified that when she learned Taylor's position would be the 12-month position despite Mureiko's greater seniority, she voiced her objection to Dr. Wilhite. In a bargaining meeting on June 21, 2007, Seibel raised the issue of Mureiko not getting the 12-month schedule. The District did not offer an explanation other than they were not obliged to assign Mureiko to the position.

Dr. Wilhite testified that he told his building principals and his assistant principal he wanted the "best person to be able to take care of that Guidance Office in the Summer regardless of seniority." Wilhite said he had principal Hallberg and assistant principals Pietranczyk and Pam Hodgson interview candidates for the position and recommend them to Wilhite.

District board president Waitekus testified that in the 17 years she had been on the District

board there was never a practice or understanding between the Union and the District that employees who had their hours cut from 12 months to 10.5 months would have their positions restored based on seniority. She denied Mureiko's participation in union activities was discussed by the District board before the decision was made on her job application and "didn't know that Ms. Mureiko even had anything to do with organizing the union until [this hearing]." She also denied telling Mureiko to be "careful what she wished for."

Principal Hallberg testified that he had his assistant principals interview a pool of candidates for the position. They recommended Kim Taylor, and Hallberg passed the recommendation along to superintendent Wilhite. Taylor was chosen because she was the most qualified applicant. Hallberg said that there was no guidance office rule that an employee previously cut from 12 months to 10.5 months had the first right to have their hours restored to 12 months.

Current superintendent Creg Williams testified that he took part in the Union negotiations beginning in August 2007. He had never heard school board members or school administrators talk about retaliating or discriminating against Mureiko for being involved in union activities.

Emilie Junge testified that she worked as a field service director for the IFT and was the chief union negotiator with the District. During negotiations in June 2007, Union president Seibel informed Junge that Mureiko was not selected for a 12-month assignment in the guidance department even though she was the most senior secretary. Junge asked the District's attorney "what's the deal [with the Mureiko situation]," and he responded "[Mureiko will] never get it." Junge admitted that during negotiations the Union withdrew a proposal about "restoring" staff

6

who had been cut from 12 months to 10.5 months. On July 6, 2007, Junge filed a charge with the IELRB against the District.

Bargaining sessions continued through September 2007, and an agreement between the District and Union was ratified in October 2007. The parties stipulated that in the "Educational Support Staff Work Rules and Regulations" from 2002 to 2006, nothing states that employees whose schedules were reduced from 12 months to 10.5 months had a first right to a future 12-month position based on seniority.

On January 20, 2009, the ALJ issued her recommended decision and order, finding that the District committed unfair labor practices by violating sections 14(a)(1), (a)(3) and (a)(5) of the Act.

The District filed exceptions, and the IELRB affirmed the ALJ's decision. The IELRB found the evidence established a "status quo" of assigning 12-month schedules in the guidance department based on seniority. The IELRB found the District violated section 14(a)(5) of the Act when it denied Mureiko a 12-month schedule despite her seniority. The IELRB noted the District's refusal to discuss the issue and the District's attorney's statement that Mureiko would "never get it." The IELRB also found the Union established a *prima facie* case of a violation of sections 14(a)(3) and 14(a)(1) based on the timing, circumstances and comments of District representatives and the District's failure to provide a reason for denying Mureiko a 12-month schedule. One IELRB member dissented, disagreeing that the evidence established a violation of section 14(a)(3).

On appeal, the District first contends that the IELRB's finding that the District violated

sections 14(a)(5) and 14(a)(1) of the Act by unilaterally changing how the assignments were made to 12-month schedules in the guidance office at Thornton South was clearly erroneous. In response, complainants argue that the evidence established a status quo of assigning the guidance department's 12-month schedule based on seniority.

The IELRB's determination that an unfair labor practice has been committed presents a mixed question of law and fact that is subject to the clearly erroneous standard of review. Board of Education, Granite City Community Unit School District No. 9 v. Sered, 366 Ill. App. 3d 330, 336, 850 N.E.2d 821 (2006). The IELRB's decision will be deemed clearly erroneous if the reviewing court, on the entire record, makes a definite and firm conviction that a mistake has been committed. Sered, 366 Ill. App. 3d at 336.

Section 14(a)(5) of the Act prohibits educational employers from refusing "to bargain collectively in good faith with an employee representative which is the exclusive representative of employees in an appropriate unit." 115 ILCS 5/14(a)(5) (West 2006). An employer's unilateral alteration of prevailing terms and conditions of employment under negotiation during the course of bargaining constitutes an unlawful refusal to bargain. Vienna School District No. 55 v. Illinois Educational Labor Relations Board, 162 Ill. App. 3d 503, 506, 515 N.E.2d 476 (1987). A term or condition of employment is something provided by an employer which intimately and directly affects the work and welfare of employees and which has become a mandatory subject of bargaining. Vienna, 162 Ill. App. 3d at 507. A term or condition of employment *must be* an established practice to constitute a status quo. Vienna, 162 Ill. App. 3d at 507. Whether a status quo exists must be made on a "case-by-case" basis and includes an evaluation of past history, past

bargaining practice, existing contract terms and the reasonable expectations of employees. Vienna, 162 Ill. App. 3d at 509.

Vienna provides us with guidance in deciding whether the evidence in this case established a status quo of assigning the 12-month schedules in Thornton South's guidance office based on seniority. In Vienna, the Fourth District Appellate Court addressed whether a status quo was altered when the Vienna school district withheld certain annual salary increases from teachers provided for in an earlier collective bargaining agreement during negotiations for a new contract. The earlier agreement incorporated a salary schedule that provided for incremental increases to reflect additional years of experience and education. This method of salary increases had been utilized by the Vienna district for the previous 10 years and was "automatically implemented prior to the opening of the new school term." Vienna, 162 Ill. App. 3d at 505. The Vienna district refused to implement the annual step increments while negotiations for a new contract were still in progress at the beginning of the new school term and instead paid the teachers at their previous salary rate.

The teachers' bargaining agent filed a charge with the IELRB, which held that the Vienna district violated sections 14(a)(1) and (a)(5) by unilaterally altering the status quo during contract negotiations. The IELRB found that, in light of the salary schedule contained in the earlier agreement and the past practice of automatically implementing annual step increments for additional education and experience, the teachers had a reasonable expectation of receiving the increase at the beginning of the new school term. Vienna, 162 Ill. App. 3d at 505-06.

The Vienna district appealed, arguing it was not required to implement the salary

increments under the expired agreement during collective bargaining. The Fourth District disagreed and affirmed the IELRB:

> "The salary increments herein were clearly a term and condition of employment which were unilaterally altered during contract negotiations. *** The step salary increments had been utilized by the District for some 10 years. It was an established practice. The evaluations were completely objective, based upon years of experience and education attained. *** There was little discretion afforded the District. Consequently, it was reasonable for the Vienna teachers to expect salary increases prior to the beginning of the *** school year based upon education and experience. The status quo required such yearly evaluations. By withholding the salary increments, the District unilaterally altered the status quo."

Vienna, 162 Ill. App. 3d at 508-09.

The past history, past bargaining practice, existing contract terms and the reasonable expectations of the employees in the guidance office at Thornton South do not rise to the level required under Vienna to establish a status quo finding here. The decision of the IELRB was clearly erroneous on this issue.

There was no history of past practice to establish a status quo here. The method of salary increases in Vienna had been utilized for 10 years and was "automatically implemented prior to the opening of the new school term." Vienna, 162 Ill. App. 3d at 505. No comparable pattern of conduct exists in this case. Following superintendent Wilhite's February 2005 decision, the two senior secretaries in the guidance offices at Thornton North and South were appointed to the 12-

month positions. The record shows no other instances where employees in those guidance offices were assigned 12-month positions based solely on seniority.

Vienna recognized that existing contract terms should be considered in determining whether a status quo exists. Vienna, 162 Ill. App. 3d at 509. Here there were no existing contract terms or written pronouncements by the District indicating an official policy of assigning the guidance department's 12-month schedules based solely on seniority. Compare Vienna, 162 Ill. App. 3d at 505 (incremental salary structure was expressly incorporated in the earlier collective-bargaining agreement). Superintendent Wilhite testified that the memorandum was not intended to establish a course of dealing with employees who had their "hours cut being restored to those hours." The parties also stipulated that in the "Educational Support Staff Work Rules and Regulations" from 2002 to 2006, nothing states that seniority controls which employees' schedules were reduced from 12 months to 10.5 months or which employees had a first right to a future 12-month position.

The evidence of past bargaining is insufficient to show the District failed to bargain in good faith. Mureiko did testify that she asked assistant principal Pietranczyk, principal Hallberg and assistant superintendent Kilrea for clarification as to why she was not selected for a 12-month schedule, and she received no answers. Union president Seibel testified that the District did not offer an explanation other than it was not obliged to assign Mureiko the position. Also, Seibel testified that the District's attorney said "the management had the right to do whatever they wanted" and Mureiko would "never get" the 12-month position. But, our review of the record shows no proposal made by the Union to bargain over the issue of Mureiko receiving the 12-

month position, though the Union was on notice of the schedule reductions. The District cannot be held accountable for the Union's decision not to pursue the issue. Compare <u>Georgetown-Ridge Farm Community Unit School District No. 4 v. Illinois Educational Relations Board</u>, 239 Ill. App. 3d 428, 462, 606 N.E.2d 667 (1992) (failure to request bargaining can be excused where the Union lacked notice of change in labor practice). Union negotiator Junge testified that she consciously chose to withdraw a general proposal that would have given Mureiko a 12-month position. The evidence does not support a conclusion that the District refused to bargain in good faith.

Finally, we do not believe employees in the guidance office could reasonably expect seniority to be the determining factor in the selection of 12-month employees when there was no evidence of a settled past practice on which they had a right to rely. Compare <u>Vienna</u>, 162 Ill. App. 3d at 508 ("[w]here employees receive regular salary increases based upon years of service or additional education, it is reasonable for employees to expect these increments even though negotiations for a new contract are still pending").

Complainants suggest statements made by District administrators support their contention that a status quo existed. Mureiko testified that assistant principal Pietranczyk told her she would be assigned a 12-month schedule regardless of whether she was selected for the May 2007 vacancy. Union president Seibel testified that assistant superintendent Kilrea told her selection for the position would be based on seniority. But, superintendent Wilhite testified that he told his building principals and assistant principal Pietranczyk that he wanted the "best person to be able to take care of that Guidance Office in the Summer regardless of seniority." Assistant

superintendent Kilrea and principal Hallberg testified that the decisions of which employees were appointed to 12-month positions were based on who was most qualified, not on the basis of seniority. Even assuming assistant principal Pietranczyk and assistant superintendent Kilrea made such representations, there is no evidence in the record that these comments carried the weight of policy pronouncements endorsed by the board. See 105 ILCS 5/10-20, 10-20.5 (West 2006); Duda v. Board of Education of Franklin Park Public School District No. 84, 133 F.3d 1054, 1061 (7th Cir. 1998) ("[n]othing in the [Illinois] School Code allows us to infer that a superintendent or principal has been delegated policymaking authority with respect to personnel decisions").

In sum, the IELRB's finding of a "status quo" based on the facts in this record is a radical departure from the standard enunciated in Vienna and adhered to for over 23 years. The IELRB's finding that the facts here are a deviation from the "status quo" sets a new and vague definition of "status quo" that cannot be justified under the reasoning in Vienna.

Next, the District contends that the IELRB's finding that the District violated sections 14(a)(3) and 14(a)(1) of the Act by refusing to give Mureiko the 12-month position in the guidance office when she became the most senior secretary is clearly erroneous. The District argues that the evidence was insufficient to prove Mureiko was not hired for a 12-month position because of animus toward her union activity.

To establish a violation of section 14(a)(3) and section 14(a)(1) of the Act, the charging party must prove (1) the employee was engaged in protected union activity; (2) the employer was aware of that activity; and (3) the employer took adverse action against the employee for engaging in the activity. Bloom Township High School District 206 v. Illinois Educational Labor Relations Board, 312 Ill. App. 3d 943, 957, 728 N.E.2d 612 (2000). The Board's findings on

13

section 14(a)(3) and section 14(a)(1) claims are deemed *prima facie* true and correct and we will reverse only if they are against the manifest weight of the evidence. Bloom Township, 312 Ill. App. 3d at 957.

Under the analysis in Wright Line, a Division of Wright Line, Inc., 251 N.L.R.B. 1083, 1089 (1980), the Union must prove antiunion animus was a substantial or motivating factor in the District's decision to make adverse employment decisions. International Union of Operating Engineers, Local 150 v. National Labor Relations Board, 325 F.3d 818, 826 n.11 (7th Cir. 2003), citing Wright Line, 251 N.L.R.B. at 1089; City of Burbank v. Illinois State Labor Relations Board, 128 Ill. 2d 335, 345, 538 N.E.2d 1146 (1989). Antiunion motivation may be inferred from a variety of factors, such as an employer's expressed hostility toward unionization together with knowledge of the employee's union activities, proximity in time between the employee's union activities and his or her discharge, disparate treatment of employees or a pattern of conduct that targets union supporters for adverse employment action, inconsistencies between the proffered reason for discharge and other actions of the employer and shifting explanations for the discharge. City of Burbank, 128 Ill. 2d at 346. If the Union meets its burden the District must then demonstrate that it would have taken the same action in the absence of the protected conduct. International Union of Operating Engineers, 325 F.3d at 826 n.11, citing Wright Line, 251 N.L.R.B. at 1089.

The parties do not dispute that Mureiko was engaged in Union activities and that the District was aware of it. Complainants point to comments made by superintendent Wilhite and Board president Waitekus at the February 2007 bargaining session as evidence of antiunion animus. But, Dr. Wilhite told Mureiko she should be careful about making the allegations

"because we need to have substantiation to those allegations," and his comments were "mostly out of concern for [Mureiko] because [he] wanted to make sure she didn't get into trouble." He never heard comments from District board members about her future employment, did not discuss her candidacy for a guidance office position or visit "any benefit or detriment of office on [Mureiko] in any way because of her union activity." District board president Waitekus denied that Mureiko's participation in Union activities was discussed by the District board before the decision was made on her job application. Assistant superintendent Kilrea testified that he never heard the board of education members or anyone else express derogatory opinions about Mureiko or say that it was "time to get rid of her" or that she should be retaliated against.

Our review of the record leads us to conclude that there was no specific expressed hostility toward unionization, disparate treatment of union employees or shifting explanations as to why Mureiko did not receive a 12-month position. Compare Speed District 802 v. Warning, 392 Ill. App. 3d 628, 637-38, 911 N.E.2d 425 (2009) (memoranda from administrators describing the reasons for employee's discharge were inconsistent and proved the school district's reasons for not renewing teacher's contract were pretextual). Assistant principal Pietranczyk and principal Hallberg's representations to Mureiko that they did not know why she had not been selected for a 12-month position do not constitute antiunion animus. There is no evidence here to suggest that the alleged comment by Waitekus that Mureiko should be "careful what she wished for" was connected to antiunion animus. Further, as pointed out by the dissenting member of the IELRB, the District's attorney's alleged comment that Mureiko would "never get" the 12-month position cannot be traced back to the board or to antiunion animus by the board. The IELRB has chosen to invest certain remarks with motives of antiunion animus, when it is just as likely that the

15

remarks were motivated by the reasons (and the only reasons) given on the record.

The District's awareness of Mureiko's Union activities does not allow for the inference that she was discriminated against on that basis alone. See City of Burbank, 128 Ill. 2d at 348. Proximity in time is also insufficient by itself to sustain an unfair labor charge. Bloom Township High School District 206 v. Illinois Educational Labor Relations Board, 312 Ill. App. 3d 943, 728 N.E.2d 612 (2000). As the record in this case shows, there was no established practice of assigning the most senior employee in the guidance department to a 12-month position. Dr. Wilhite, Dr. Kilrea and principal Hallberg testified that the most qualified person would receive the 12-month position. Complainants offer no evidence to suggest Mureiko was the most qualified person and would have been selected for the position but for the District's antiunion animus.

We conclude, as did the IELRB's dissenting member, that the evidence is insufficient to prove it was Mureiko's *union activity* that was a substantial or motivating factor in the District's decision to deny her a 12-month position in the guidance office. The Board's findings that the District violated sections 14(a)(3) and 14(a)(1) of the Act were against the manifest weight of the evidence. We reverse the Board's finding on this issue.

Because we have reversed the Board's findings based on the District's first two arguments, we need not address its remaining arguments that the ALJ was biased against the District and the remedy announced by the ALJ was improper.

The judgement of the Board is reversed.

Reversed.

J. GORDON and McBRIDE, JJ., concur.

16