In the

# United States Court of Appeals
### For the Seventh Circuit

No. 12-1755

SEAN GSCHWIND,

*Plaintiff-Appellant,*

*v.*

LINDA HEIDEN, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 08 C 50035—**Philip G. Reinhard**, *Judge.*

ARGUED AUGUST 7, 2012—DECIDED AUGUST 31, 2012

Before POSNER, TINDER, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff taught sixth-grade math at a public school in Harvard, Illinois, a small town. He was forced to resign after he complained to school administrators and the police about a threat to him made by one of his students. He claims in this civil rights suit against the school's principal and assistant principal and against the school district that his forced resignation was in retaliation for his exercising his

First Amendment right of free speech. The district court granted summary judgment for the defendants on the ground that the plaintiff's complaint about being threatened was not protected by the First Amendment because it did not involve a matter of public concern.

The basic facts are not in dispute. Before the student threatened him, the plaintiff had met with the parents about a threat the student had made to another student. Later the plaintiff had seen the student beat up another student in the hallway of the school, and again he met with the student's parents. The student's father used that occasion to threaten the plaintiff with a class-action lawsuit and to tell him that the father's older son, who had assaulted the assistant principal, should have assaulted the plaintiff instead.

Several days later the plaintiff happened to call on the student in class to perform the student's "math karaoke"—the plaintiff had given the students an assignment to create a song the lyrics of which would relate to something they'd learned in the class. The student's song added "I stabbed Gschwind" to the lyrics of the Gangsta Rap song "Boyz in da hood," www.youtube.com/watch?v= fGeNDnYcQOA (visited Aug. 28, 2012). The plaintiff was disturbed and stopped the class. The student was 12 or 13.

The plaintiff spoke to the school's police liaison and to the principal and the assistant principal (the latter, remember, had been the victim of the assault by the student's brother). The plaintiff talked of filing a criminal complaint, and later did. He acknowledges having

been afraid for his safety, but he explained in an affidavit in this litigation that his fear "co-existed with a desire to report the singing of the song as a crime that had been committed, to help ensure the smooth and safe operation of the school and everyone inside . . . . The point of signing the disorderly conduct complaint was to bring to the public light the fact that such an incident had occurred." He testified similarly in his deposition: "as far as it [the complaint] being a matter of public concern, it involved disorderly conduct that occurred in the classroom. That disorderly conduct had to do with public safety issues."

The police liaison encouraged him to file the criminal complaint, pointing out that Illinois law declares a knowing threat of violence against a person at a school to be a form of disorderly conduct, 720 ILCS 5/26-1(a)(13), and telling him that "the city feels it's important that this student go in front of a judge and explain his actions." The principal and assistant principal were not supportive, however, fearing that the parents would sue. Nevertheless the plaintiff signed the complaint (this was three weeks after the singing of "I stabbed Gschwind" in his class) and the student was charged with disorderly conduct; we have not been told the outcome. The school initially suspended him for three days but then reduced the suspension to two.

The day after the plaintiff signed the criminal complaint, the assistant principal out of the blue gave him an "unsatisfactory" evaluation; his previous evaluations had all been "satisfactory" and he had not been warned

of problems that might result in a 180 degree change in his evaluation. The ostensible basis of the new evaluation was "lack of interpersonal skills in relating to students, parents, and colleagues." A jury could easily find that the real reason was the threat of litigation by the student's belligerent father.

The defendants admitted in their answer to the plaintiff's complaint that they had "informed Plaintiff that they had both come to the conclusion that Plaintiff's employment with the School District should not continue beyond the end of the school year and that, if Plaintiff did not resign his teaching position before the next Board of Education meeting, Principal Heiden would recommend to the Board of Education that Plaintiff's teaching contract not be renewed for the following year." Since, as we'll see, the board's policy was to rubber stamp personnel decisions by the school district's superintendent, who in turn rubber stamped personnel decisions by principals, it is apparent that the plaintiff was being fired—as he put it in his complaint, being "compelled to resign." The defendants do not deny that he was constructively discharged. See, e.g., *Kodish v. Oakbrook Terrace Fire Protection District*, 604 F.3d 490, 502 (7th Cir. 2010); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008).

But they argue that even if they fired the plaintiff in retaliation for his complaining to them about the student and particularly for his filing the criminal complaint, the complaining and the filing were purely personal acts on his part and thus not the exercise of

his right of free speech. *Houskins v. Sheahan*, 549 F.3d 480, 490-92 (7th Cir. 2008). The district judge agreed, saying that "the undisputed facts overwhelmingly demonstrate that plaintiff signed the complaint purely as a matter of private interest . . . as a perceived victim of a crime and out of concern for his own personal safety."

Violence in schools is a subject in which the public these days is highly interested, with the added twist in this case, which would amplify the public's interest, that the father of the student who made the threat appears to have endorsed it. Nevertheless the plaintiff in filing the criminal complaint might have had no interest in making a public statement about school violence, but have only wanted to deter further threats against himself. However, in saying that the undisputed facts "overwhelmingly demonstrate[d]" that the latter was the correct interpretation of the plaintiff's reaction to "I stabbed Gschwind," the district judge overlooked the statement in the plaintiff's affidavit that he had filed the criminal complaint in part "to help ensure the smooth and safe operation of the school and everyone inside" and, more important to a free-speech claim, "to bring to the public light the fact that such an incident had occurred." As pointed out in *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 942 (7th Cir. 2004), "speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests" (emphasis in original).

The defendants state in their brief that the plaintiff's "contention that he signed the juvenile complaint for disorderly conduct to bring to the public light the fact that such an incident had occurred in his classroom is belied by the fact that under the Illinois Juvenile Court Act, both law enforcement records and court records relating to juveniles are deemed to be confidential and cannot be inspected, unless by order of court or by strict exceptions set forth in the Juvenile Court Act. Members of the public have no unfettered right of access to juvenile court records" (record reference and citation omitted). It is true that the *records* are sealed, 705 ILCS 405/1-7, -8, but that doesn't preclude the victim of a juvenile crime, or anyone else for that matter (us judges for example), from talking about the crime, whether privately or in public. Indeed, we know from the Pentagon Papers case (*New York Times Co. v. United States*, 403 U.S. 713 (1971)), and from many cases since, that often the First Amendment is held to protect a disclosure of state secrets that violates state law—not to mention obnoxious invasions of personal privacy, as in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), which involved a radio station's violation of a state law limiting public disclosure of the names of rape victims. (See the discussion of that and related cases in *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229-32 (7th Cir. 1993).) And certainly the incident giving rise to the accusation—"I stabbed Gschwind"—could not be silenced consistently with the First Amendment. It has in fact been reported, see David L. Hudson Jr., "Fired Math Teacher's Retaliation

Claim Nixed" (First Amendment Center, Oct. 27, 2011), www.firstamendmentcenter.org/fired-math-teachers-retaliation-claim-nixed (visited Aug. 15, 2012), and of course is being reported in this opinion. And finally the juvenile criminal secrecy law is so riddled with exceptions—for police, prosecutors, judges, social workers, and other officials, see 705 ILCS 405/1-7(A), -8(A)—that there was actually a rather sizable public for the records of the criminal proceeding without any reporting by the media.

We are mindful—have indeed emphasized—that academic administrators are entitled, in the name of academic freedom and efficient educational administration, to a considerable degree of judicial forbearance in matters of discipline. See, e.g., *Brandt v. Board of Education of City of Chicago*, 480 F.3d 460, 467 (7th Cir. 2007). Realistically they can't be indifferent to parental pressure and to the threats and the actuality of suits engendered by indignant (though biased and often overprotective and downright unreasonable) parents. But Illinois law has curtailed that discretion in respects directly relevant to this case by requiring that any incident of battery or intimidation (which includes threats, see 720 ILCS 5/12-6(a)(1)) in a school be reported immediately to law enforcement authorities. 105 ILCS 5/10-21.7, 5/34-84a.1. There has been no suggestion that such regulations infringe academic freedom protected by the First Amendment.

So summary judgment should not have been granted on the ground that the plaintiff's criminal complaint

was a matter of purely private concern. But we must also consider the liability of the particular defendants should the plaintiff succeed on remand in proving a violation of his right of free speech.

The principles on which this suit is based are well settled, which defeats the individual defendants' claim of qualified immunity. The school district, however, cannot be held liable for the tortious conduct of the principal and assistant principal under the doctrine of respondeat superior. It can be held liable only for its own conduct or that of its highest official or officials charged with responsibility for making the kind of decision, in this case a termination of employment, that is challenged. In Illinois the school board is the ultimate policymaking body with regard to personnel decisions. 105 ILCS 5/10-20, 20.7. The school district's superintendent, although the highest official of the school district, is not a member of the board and does not have the ultimate responsibility for such decisions. 105 ILCS 5/10-16.7, -21.4; *Thornton Fractional High School District No. 215 v. Illinois Educational Labor Relations Board*, 936 N.E.2d 1188, 1196 (Ill. App. 2010); *Duda v. Board of Education of Franklin Park Public School District No. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998).

The superintendent authorized the principal to fire Gschwind, and the board approved that decision. When Gschwind complained to the superintendent about the decision of the principal and assistant principal to force him to resign, the superintendent replied that "it was the policy of the school district and

the Board of Education to allow principals and assistant principals to make evaluation and employment decisions as they see fit with respect to the teachers they supervise and for the school district and the Board of Education to follow these decisions and recommendations." This was evidence of a policy of the school district of condoning unconstitutional terminations, since principals and assistant principals might "see fit" to fire teachers on unconstitutional grounds. See *Cornfield by Lewis v. Consolidated High School District No. 230*, 991 F.2d 1316, 1325-26 (7th Cir. 1993); *Mortimer v. Baca*, 594 F.3d 714, 716 (9th Cir. 2010).

After the holding in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), that an employer's policy of granting its supervisors discretion to make personnel decisions can't be the subject of a class action against the employer by employees complaining of discrimination by the supervisors, it is easy to jump to the conclusion that such a policy cannot be the basis of an individual (as distinct from class action) suit against the employer, either. Easy, but wrong. *Wal-Mart* distinguishes between the lack of "commonality" among the class members when multiple supervisors made the employment decisions of which the class is complaining—commonality being a prerequisite for a class action—and the possibility "that 'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability . . . since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination,'" *id.* at 2554, quoting *Watson*

*v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988). Or as we put it in *Bolden v. Walsh Construction Co.*, No. 12-2205, 2012 WL 3194593, at *3 (7th Cir. Aug. 8, 2012), "when multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question." For sure that is not this case.

The suit was terminated prematurely.

REVERSED AND REMANDED.