NOTICE
Decision filed 11/6/17. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2017 IL App (5th) 160229

NO. 5-16-0229

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 31, | ) ) ) | Petition for Review of an Order of the Illinois Labor Relations Board, |
| Petitioner, | ) ) | State Panel. |
| v. | ) ) | |
| THE ILLINOIS LABOR RELATIONS BOARD and THE STATE OF ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, | ) ) ) | No. S-CA-16-006 |
| Respondents. | ) ) | |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Goldenhersh and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    The American Federation of State, County, and Municipal Employees, Council 31 (AFSCME), and the State of Illinois Department of Central Management Services (CMS) have a lengthy collective bargaining relationship. Their most recent collective bargaining agreement (CBA), like all their previous agreements, contained provisions for employees to receive various types of increases in salary, including "step increases." Shortly before the CBA was set to expire, CMS announced that it would stop paying step increases after the CBA expired, and in fact did so. AFSCME filed an unfair labor charge, alleging that

1

CMS's refusal to continue paying the increases constituted an unfair labor practice because it altered a term of employment and therefore failed to preserve the status quo between the parties during contract negotiations. The Illinois Labor Relations Board (ILRB or Board) dismissed the charge, finding that the status quo between the parties included payment of step increases only upon agreement of the parties. AFSCME filed a petition for review with this court, arguing that this finding was clearly erroneous. Both CMS and the ILRB argue that the decision was not clearly erroneous. CMS also argues that we may affirm the Board's decision for two additional reasons. It argues that the CBA was void under section 21.5 of the Illinois Public Labor Relations Act (Labor Relations Act) (5 ILCS 315/21.5 (West 2014)) and, as such, the statute negates any obligation to pay step increases. CMS also argues that any obligation to pay salary increases absent a legislative appropriation of funds to pay them is void under the Illinois Supreme Court's recent decision in *State v. American Federation of State, County & Municipal Employees, Council 31*, 2016 IL 118422 (*State/CMS*).

¶ 2    While this matter was pending, CMS filed motions asking this court to take judicial notice of unrelated proceedings involving the same parties. In those matters, all of which involved a single decision of the ILRB, AFSCME argued that the decision was not final and reviewable because the procedures followed by the ILRB did not comport with the Open Meetings Act (or Act) (5 ILCS 120/1 *et seq.* (West 2014)), a position CMS contends is inconsistent with AFSCME's invocation of our jurisdiction in this case. CMS filed an additional motion asking us to remand this matter to the ILRB to allow the ILRB to conduct additional proceedings that would eliminate any Open Meetings Act problem.

2

Although none of the parties challenge our jurisdiction, the question of jurisdiction is implicated by these motions, and we must therefore address it. We find that we have jurisdiction, we grant CMS's motions to take judicial notice, we deny CMS's motion to remand, and we reverse the decision of the ILRB.

¶ 3     AFSCME and CMS have a lengthy history of collective bargaining dating back to the 1970s. Their most recent CBA was in effect from July 1, 2012, to June 30, 2015. The agreement includes provisions for various types of salary increases. Article 19, section 9, of the CBA provides for semiautomatic in-series promotions to fill vacancies. Article 32, section 4, provides that each employee must receive an increase to the next step within his or her pay grade "upon satisfactory completion of twelve months creditable service." Article 32, section 6(c), provides for "longevity pay increases" for employees who reach the top step and have 10 or more years of creditable service.

¶ 4     The parties began negotiating a successor agreement in February 2015 but did not come to an agreement before the CBA expired. On June 16, two weeks before the agreement was set to expire, CMS announced that it was proposing freezing or eliminating step increases, longevity increases, and the semiautomatic promotions in the new CBA and that it would not pay these increases during negotiations.

¶ 5     The parties entered into the first of three tolling agreements on June 27, 2015. In pertinent part, the tolling agreement provided that "The Parties disagree with respect to the Employer's obligation to continue step increases and semi-automatic promotion increases. The Agreement does not prejudice either Party's position on that issue." The agreement further provided that neither party waived any of its legal or contractual rights

3

unless explicitly provided in the tolling agreement. The parties entered into two subsequent tolling agreements on July 29 and September 9, 2015, each of which contained language identical to the pertinent language in the first tolling agreement. (We note that CMS eventually withdrew its proposals to freeze or eliminate both longevity increases and semiautomatic promotions. Thus, only the step increases are at issue in this appeal.)

¶ 6 On July 1, 2015, CMS stopped paying step increases. On July 27, AFSCME filed an unfair labor charge, alleging that this constituted an unfair labor practice because it did not preserve the status quo between the parties during negotiations. On October 16, the Board issued a complaint for hearing. On November 6, it issued an amended complaint, which alleged as follows: On July 1, 2015, CMS stopped granting and paying step increases during contract negotiations without an agreement from the union. The parties had not reached an impasse. The complaint alleged that this violated section 10(a)(4) of the Labor Relations Act (5 ILCS 315/10(a)(4) (West 2014)) because it was a unilateral change that did not maintain the status quo.

¶ 7 The matter was assigned to administrative law judge (ALJ) Sarah R. Kerley. She held a hearing in December 2015 and issued her recommended decision and order on February 3, 2016. Kerley's recommended decision contained detailed findings of fact. She found that AFSCME began representing two of the eight bargaining units involved in this dispute in 1974 and eventually expanded its representation to include all eight. She found that the parties agreed to step increases in every CBA they entered into, although the specific parameters of those increases changed over the years. The step increases and

4

longevity increases go into effect on the anniversary dates of the individual employees receiving them.

¶ 8     Kerley found that the parties were nearly always able to complete negotiations for a new CBA before the expiration of their previous agreement. Prior to the negotiations at issue in this case, negotiations continued past the expiration date of their CBA only three times. The first time was in 1983. That year, the parties signed a tolling agreement in which they agreed that the step increases would be frozen temporarily. The CBA they ultimately signed required that step increases be paid retroactively to the employees who did not receive them during the freeze.[1]

¶ 9     The second time the parties did not agree to a new contract before their old contract expired was in 2008. That time, they executed a tolling agreement which provided that all terms of the previous CBA would remain in effect, including the step increases.

¶ 10    The third time negotiations ran past the expiration date of the previous CBA was in 2012. Kerley found that during this period, the parties could not agree concerning the interim handling of the step increases and longevity increases. They signed two tolling

---

[1]We note that AFSCME argues that the ALJ "misstated" some of the facts surrounding the 1983 contract hiatus. AFSCME asserts that by 1983, it represented five bargaining units. One of those bargaining units, however, was decertified before the CBA expired on June 30, 1983, because the unit improperly included both professional and nonprofessional employees. The situation was ultimately remedied by creating two separate bargaining units. By 1984, AFSCME represented all eight bargaining units, including those two units. During the period in which the employees in the decertified bargaining unit were *not* represented by AFSCME, CMS continued to honor the requirements of the CBA, including the payment of step increases. This included the period during which CMS and the remaining bargaining units were between contracts. Thus, AFSCME asserts, at least some of the employees received step increases during this period without an agreement. AFSCME also argues that the ALJ erred in failing to find that the state's pay plan called for employees to receive step increases even before AFSCME began representing any of the bargaining units in 1974. We need not resolve these arguments because they would not alter our decision.

agreements, each of which expressly noted the parties' disagreement over the increases. CMS refused to sign a third tolling agreement, but notified the union that it would continue to honor all terms of the expired CBA except payment of the step increases and longevity increases. Kerley found that CMS continued to pay the salary increases associated with semiautomatic promotions throughout the hiatus between CBAs, but it did not pay the step increases or longevity increases. She noted that AFSCME filed two grievances and an unfair labor charge challenging this practice. However, the parties settled the grievances, and AFSCME withdrew the unfair labor charge in August 2013 while it was still in the investigatory stage. The parties' 2012-15 agreement provided for retroactive payment of the step increases and longevity increases. The parties also stipulated that CMS paid the step increases throughout the first six months of 2015.

¶ 11    Kerley next considered the current negotiations. She found that CMS began processing and paying the longevity increases and semiautomatic promotions after withdrawing its proposals to eliminate them. She found, however, that CMS had not paid the step increases since July 1, 2015. The parties stipulated that they had not reached an impasse.

¶ 12    In her analysis, Kerley first considered the applicability of section 21.5 of the Labor Relations Act. That statute provides that (1) a CBA between a public employer and a labor organization may not expire after June 30 of the year in which the terms of the Governor and other executive branch officers begin (5 ILCS 315/21.5(a) (West 2014)) and (2) a CBA may not require any salary increases in the period between the date on which the Governor and other executive branch officers take office and the date on which

6

the contract terminates (5 ILCS 315/21.5(b) (West 2014)). Kerley noted that the parties' most recent CBA violated the second prohibition because it required longevity and step increases to go into effect on the anniversary dates of employees with anniversary dates between January 12, 2015, the day the new Governor took office, and June 30, 2015. She therefore found that the CBA was rendered null and void pursuant to subsection (c). 5 ILCS 315/21.5(c) (West 2014). However, Kerley also found that the obligation to maintain the status quo exists independent of the CBA. She thus rejected CMS's argument that section 21.5 relieved it of any obligation it might have to pay the step increases in order to maintain the status quo.

¶ 13     Kerley concluded, however, that the status quo between the parties did not include payment of the step increases during hiatuses between contracts. She first noted that the status quo is not determined by the provisions in the most recent CBA in all cases. Kerley then examined all four hiatuses between contracts—including the period at issue after expiration of the 2012-15 contract. She pointed out that CMS did not pay the step increases during three of the four periods. She acknowledged that the step increases *were* paid after the parties' CBA expired in 2008; however, she emphasized that the parties agreed that they would be paid. Thus, she reasoned, the step increases had never been paid without an agreement that they would be paid.

¶ 14     Kerley further found that the hiatus between the expiration of the 2008-12 agreement and the eventual signing of their 2012-15 agreement was the "most factually similar" time period to the instant case. Emphasizing that the step increases were not paid during that period, she further found that nothing had changed since 2012 "that would

7

cause employees to reasonably expect anything different to happen in 2015 than what occurred in 2012." Kerley concluded that the status quo did not include payment of the step increases "absent an agreement to do so." She thus recommended dismissal of the unfair labor charge.

¶ 15 On March 16, 2016, AFSCME filed exceptions to the ALJ's decision with the ILRB. AFSCME argued that the ALJ erred in failing to consider or give any weight to various factors, including the following: (1) the fact that the 2008 tolling agreement included step increases, (2) the fact that the nonpayment of step increases after the 2008-12 CBA expired was the subject of two grievances, which were settled, and (3) the parties' 40-year history of including step increases in their agreements. AFSCME also argued that she erred in failing to find that employees in the bargaining units were paid step increases pursuant to the state's pay plan even before unionization. On March 31, CMS filed cross-exceptions challenging Kerley's interpretation of section 21.5.

¶ 16 On May 10, 2016, the State Panel of the ILRB voted to affirm the recommended decision of the ALJ. The vote took place at a public meeting. On May 26, the Board issued its written decision. The decision sets forth the procedural history of the case. It then states, "After reviewing the record, exceptions, cross-exceptions[,] and responses, we hereby affirm the Recommended Decision and Order, as written, for the reasons set forth by the Administrative Law Judge." AFSCME filed a petition for review with this court on June 3, 2016. See 5 ILCS 315/11(e) (West 2014).

¶ 17 On December 6, 2016, CMS filed a motion asking us to take judicial notice of an appeal pending in the Fourth District involving the same parties. Two days later, CMS

8

filed another motion asking us to take judicial notice of two additional proceedings involving the same parties—an appeal in the First District and a civil action filed by AFSCME in the Cook County circuit court. In those matters, all of which involved a single decision of the ILRB, AFSCME asserted that the decision was not a valid final administrative decision because the ILRB's procedures violated the Open Meetings Act. CMS argued in the motions it filed in this case that because the ILRB followed the same procedures in this case that it followed there, AFSCME's position in those proceedings is inconsistent with its invocation of our jurisdiction in this case.

¶ 18    On December 21, 2016, CMS filed a motion asking us to remand this matter to the ILRB without considering the merits. CMS took no position on the Open Meetings Act argument raised by AFSCME in the other proceedings, but it argued that, in light of the unsettled Open Meetings Act question, the interest of judicial economy would be best served by remanding the matter to the ILRB to allow it to hold additional proceedings that would eliminate any Open Meetings Act problem. Both AFSCME and the ILRB opposed the motion to remand.

¶ 19    We heard oral argument in this case in April 2017. At that time, we asked all three parties to provide us with supplemental arguments on the questions of jurisdiction and CMS's motion for remand. We note that none of the parties have argued that we lack jurisdiction. Nevertheless, we have an obligation to independently consider our jurisdiction, even if it is not challenged by the parties. See *Fligelman v. City of Chicago*, 264 Ill. App. 3d 1035, 1037 (1994). We will therefore address the question. We turn now to the issues raised by CMS's motions.

9

¶ 20 We first consider the two motions to take judicial notice. A court may take judicial notice of documents in the records of other courts or administrative tribunals. *NBD Highland Park Bank, N.A. v. Wien*, 251 Ill. App. 3d 512, 520 (1993) (citing *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159 (1976)). We therefore grant both motions and take judicial notice of the proceedings CMS identified.

¶ 21 As we mentioned earlier, all three proceedings involved one decision of the ILRB. There, each party filed an unfair labor charge against the other party. The two charges were consolidated for a hearing. The ALJ who presided issued a lengthy recommended decision and order. Both parties filed exceptions to different portions of the decision. The ILRB did not adopt the ALJ's decision in its entirety. Instead, it voted to adopt only certain portions of the ALJ's order. The vote took place at a hearing that was open to the public.

¶ 22 CMS filed a petition for review with the Fourth District almost immediately, before the ILRB issued a written order. AFSCME filed a motion to dismiss, arguing primarily that the decision of the ILRB was not a final and reviewable decision because no written decision had been issued. See 5 ILCS 315/11(c), (e) (West 2014). AFSCME further argued that for a written decision of the ILRB to be final and reviewable, the ILRB must comply with the requirements of the Open Meetings Act. AFSCME argued that to comply with the Open Meetings Act, the ILRB would need to vote on the final written order at a meeting open to the public. See *Baldermann v. Board of Trustees of the Police Pension Fund*, 2015 IL App (1st) 140482, ¶ 37; *Howe v. Retirement Board of the*

*Firemen's Annuity & Benefit Fund*, 2013 IL App (1st) 122446, ¶ 32. It is this latter argument that CMS calls to our attention in its motions.

¶ 23 A few weeks after CMS filed its petition for review in the Fourth District, the ILRB issued its written decision. It did not hold an additional public hearing to vote on that decision. AFSCME then filed a petition for injunctive relief in Cook County, arguing that this procedure violated the Open Meetings Act. See 5 ILCS 120/3(a) (West 2014) (providing that any individual may bring a civil action seeking relief for violations of the Open Meetings Act). AFSCME also filed its own petition for review in the First District, addressing the merits of the ILRB's decision in case it does not prevail on its Open Meetings Act argument. The First District appeal was subsequently transferred to the Fourth District and consolidated with the appeal previously filed there. The consolidated appeal remains pending.

¶ 24 Before we turn to the question of jurisdiction, we believe that a brief explanation of the rationale underlying AFSCME's Open Meetings Act argument would be helpful. The statutory definition of a "public body" includes administrative agencies of the State, thus the ILRB is a public body subject to the requirements of the Act. See 5 ILCS 120/1.02 (West 2014). The Open Meetings Act requires that all meetings of public bodies be open to the public, with certain exceptions. 5 ILCS 120/2(a) (West 2014). Under one exception, a public body may hold a closed meeting to consider evidence and testimony that was presented in an open meeting, "provided that the body prepares and makes available for public inspection a written decision setting forth its determinative

11

reasoning." 5 ILCS 120/2(c)(4) (West 2014). Public bodies must take all final actions in open meetings. 5 ILCS 120/2(e) (West 2014).

¶ 25   Here, the ILRB held a public meeting to consider the parties' exceptions to ALJ Kerley's recommended decision and order. The Board voted at that meeting to adopt her decision in its entirety. However, Board members signed the written decision a few days later at a closed meeting. As noted earlier, that decision sets forth the procedural history of the case and states that the ILRB affirms the ALJ's decision "*as written*, for the reasons set forth by the Administrative Law Judge." (Emphasis added.) The ILRB's written decision does not include independent findings of fact or conclusions of law. Essentially the same procedure was followed in the Fourth District proceedings. There, however, the ILRB did not adopt all of the findings of the ALJ. Thus, presumably, the written decision signed by Board members also included a recitation of which findings it was adopting.

¶ 26   In the motion to dismiss AFSCME filed in the Fourth District, it cited two cases in which panels of the First District found that, at least in some circumstances, signing a final written decision at a closed meeting violates the Open Meetings Act even if it is done after a vote is taken at an open meeting. See *Baldermann*, 2015 IL App (1st) 140482, ¶ 37; *Howe*, 2013 IL App (1st) 122446, ¶¶ 25-26. Both panels held that the underlying administrative actions were not valid final decisions. *Baldermann*, 2015 IL App (1st) 140482, ¶ 39; *Howe*, 2013 IL App (1st) 122446, ¶ 32. We note that both cases involved additional procedural irregularities that supported the panels' decisions. *Baldermann*, 2015 IL App (1st) 140482, ¶¶ 35-36; *Howe*, 2013 IL App (1st) 122446,

¶ 32. However, the *Howe* court used broad language in holding "that the written decision must be prepared and provided to each board member at or before the time the Board votes to take final action." *Howe*, 2013 IL App (1st) 122446, ¶ 25; see also *Baldermann*, 2015 IL App (1st) 140482, ¶ 37 (following *Howe* on this point). Both panels concluded that, as a result, they lacked jurisdiction to review the decisions. *Baldermann*, 2015 IL App (1st) 140482, ¶ 39; *Howe*, 2013 IL App (1st) 122446, ¶ 32.

¶ 27    As stated previously, AFSCME argued in the Fourth District that the ILRB ruling at issue there was not a valid final administrative decision under *Baldermann* and *Howe*, thereby depriving the appellate court of jurisdiction to consider the CMS's appeal. Accepting this argument and applying it to this case would mean that we do not have jurisdiction over this case either.

¶ 28    We need not determine whether the procedure followed in this case fully complied with the Open Meetings Act. For the reasons that follow, we find that, even assuming the proceedings did not fully comport with the Act's requirements, the ILRB's decision in this case was a final administrative decision, and it was not inherently null and void.

¶ 29    The Open Meetings Act provides two alternative mechanisms for individuals to seek redress for violations (or anticipated violations) of its requirements. Any individual may file a petition in court alleging that a public body has not complied with the requirements of the Act or that there is probable cause to believe a public body will hold proceedings that do not comply. 5 ILCS 120/3(a) (West 2014). The trial court has the discretion to "grant such relief as it deems appropriate." 5 ILCS 120/3(c) (West 2014). The court has the authority to declare "null and void any final action taken at a closed

meeting in violation" of the Open Meetings Act. *Id.* However, that is not the only type of relief the court may grant. It can instead grant an injunction barring future violations or order the public body to make the minutes of any closed meetings available to the public. *Id.* As an alternative, any individual seeking redress for a violation may file a request for review with a "Public Access Counselor" established as part of the office of the Attorney General. 5 ILCS 120/3.5(a) (West 2014). After review, the Attorney General must issue a binding opinion. If the Attorney General concludes that a violation has occurred, the opinion can direct the public body to take appropriate action. 5 ILCS 120/3.5(e) (West 2014).

¶ 30    As these procedures indicate, administrative actions taken in violation of the Open Meetings Act are ordinarily voidable; they are not automatically void. That is, a declaration that an action or decision is null and void is a remedy that must be requested and granted. Moreover, declaring an action or decision null and void is considered an "extreme remedy," which will not be granted in all cases. See *People ex rel. Graf v. Village of Lake Bluff*, 321 Ill. App. 3d 897, 908 (2001), *rev'd on other grounds*, 206 Ill. 2d 541, 544 (2003).

¶ 31    Likewise, we do not believe that a failure to comply with the requirements of the Open Meetings Act will ordinarily prevent an administrative decision from being deemed "final." In this regard, we note that the circumstances before us are markedly different from those involved in both *Howe* and *Baldermann*. As noted earlier, those cases involved multiple procedural flaws in addition to the fact that the final written orders were signed in closed meetings. In *Howe*, a member of a board considering an injured

14

paramedic's application for duty disability benefits made a motion to grant the application, and the board voted against that motion. However, there was no indication that the board members ever actually voted on a motion to deny the application before issuing a written decision denying the benefits. *Howe*, 2013 IL App (1st) 122446, ¶¶ 13-14. In *Baldermann*, the agency's written decision did not include all of the findings it was required to make. *Baldermann*, 2015 IL App (1st) 140482, ¶ 36. While these flaws may have justified finding that the administrative decisions at issue in those cases were not final decisions, we do not believe the same result is warranted here.

¶ 32   We express no opinion on whether the procedures followed in this case violated the Open Meetings Act. We also express no opinion on whether a declaration voiding the decision would be an appropriate remedy in the event that the ILRB's procedures were found to violate that Act. We conclude only that the written decision of the ILRB is a final administrative decision, which we have jurisdiction to review.

¶ 33   We next consider CMS's motion to remand this matter to the ILRB without first addressing the merits. CMS notes that AFSCME itself cannot challenge the validity of the decision under the Open Meetings Act because the 60-day time limit for doing so has passed. See 5 ILCS 120/3(a), 3.5(a) (West 2014). However, CMS points out that any individual may file a request for review with the Public Access Counselor within 60 days after discovering the violation of the Open Meetings Act as long as the individual does so within two years after the alleged violation occurred. 5 ILCS 120/3.5(a) (West 2016). Under this provision, CMS contends, any union member or member of the public who was not previously aware of the decision may file a request for review until May 26,

2018. CMS further contends that if such a request is successful, the Attorney General could nullify the ILRB's May 2016 decision, which would make our decision in this case moot. We are not persuaded.

¶ 34    CMS's argument in favor of remand is based upon multiple layers of speculation. It requires us to assume that (1) some individual will file a request for review, (2) the Attorney General will find that a violation has occurred, and (3) the extreme remedy of declaring the decision null and void will be imposed. Each of these possibilities is highly speculative. We decline to remand this matter to the ILRB without considering the merits based on these speculative possibilities. We therefore deny the motion and turn to the merits of this appeal.

¶ 35    Judicial review of ILRB decisions is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014)). *County of Cook v. Licensed Practical Nurses Ass'n of Illinois, Division I*, 284 Ill. App. 3d 145, 152 (1996). The scope of our review includes all questions of fact and law presented by the record. *Id.* The standard of review we employ depends on whether each issue presents a question of fact, a question of law, or a mixed question of fact and law. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532 (2006). The ILRB's findings of fact are considered *prima facie* true and correct, and we will not set aside purely factual determinations unless they are against the manifest weight of the evidence. *County of Cook*, 284 Ill. App. 3d at 152. We review purely legal issues—such as statutory construction—*de novo*. However, we recognize that the ILRB's interpretation of the statutes it administers "flows from its experience." *Id.* We therefore give deference to the ILRB's interpretation of those

statutes. *Id.* We review mixed questions of fact and law under the "clearly erroneous" standard. *Marconi*, 225 Ill. 2d at 532. Under this standard, we reverse the ILRB's decision if our review of the entire record leaves us with "a definite and firm conviction" that the Board made a mistake. *Thornton Fractional High School District No. 215 v. Illinois Educational Labor Relations Board*, 404 Ill. App. 3d 757, 763 (2010).

¶ 36 This appeal calls for us to resolve three issues: (1) whether the ILRB correctly found that CMS did not alter the status quo during contract negotiations, (2) the effect of section 21.5 of the Labor Relations Act (5 ILCS 315/21.5 (West 2014)) on CMS's obligation to pay step increases, and (3) the effect of the supreme court's decision in *State/CMS* on CMS's obligation to pay the step increases. AFSCME contends that the ILRB's conclusion concerning the status quo was clearly erroneous and that neither section 21.5 nor *State/CMS* negates CMS's obligation to pay the step increases. We agree.

¶ 37 We first consider the Board's findings concerning the status quo. Under the Labor Relations Act, public employers and the unions representing their employees are required to bargain collectively over the terms and conditions of employment. 5 ILCS 315/7 (West 2014). The refusal of either party to bargain in good faith is an unfair labor practice. 5 ILCS 315/10(a)(4), (b)(4) (West 2014).

¶ 38 Courts have held that an employer violates the requirement of bargaining in good faith if it unilaterally alters any of the "prevailing terms and condition of employment" while the parties are negotiating the terms of a CBA. *Vienna School District No. 55 v. Illinois Educational Labor Relations Board*, 162 Ill. App. 3d 503, 506-07 (1987) (citing

17

*National Labor Relations Board v. Katz*, 369 U.S. 736, 743-47 (1962)). Such changes are prohibited because they frustrate the " 'objective of establishing working conditions through [collective] bargaining.' " *Id.* at 507 (quoting *Katz*, 369 U.S. at 744). The goal is to maintain the status quo until the parties agree to new terms and conditions of employment through the collective bargaining process. For this reason, an employer may not make unilateral changes unless and until the parties reach an impasse. *Id.*

¶ 39 Whether an employer has committed an unfair labor practice by unilaterally altering the status quo is a mixed question of fact and law. Therefore, we will apply the clearly erroneous standard of review. *Thornton Fractional High School District*, 404 Ill. App. 3d at 763.

¶ 40 Here, there is no dispute that the step increases are a term or condition of employment, and there is no real question that CMS made a unilateral decision to withhold the step increases during negotiations. The question is whether this decision altered the status quo. More precisely, the question is whether the status quo between the parties included payment of the step increases.

¶ 41 In order to constitute part of the status quo between the parties, a term or condition of employment must be an established practice. *International Union of Operating Engineers, Local 150*, 23 PERI ¶ 39 (ILRB State Panel 2007) (citing *Katz*, 369 U.S. 736). The test for determining whether a practice is sufficiently established to constitute the status quo was set forth by the Fourth District in *Vienna School District*. As the court explained, our inquiry must take into account both the reasonable expectations of the employees and "whether the status quo would have been clearly apparent to an

18

objectively reasonable employer at the time in question." *Vienna School District*, 162 Ill. App. 3d at 507. In making this determination, we consider the following four factors: (1) the parties' past history, (2) their past bargaining practices, (3) the terms of the existing CBA, and (4) the reasonable expectations of the employees. *Id.* at 509.

¶ 42 The status quo must be determined on a case-by-case basis. *Id.* Generally, however, where an employer has regularly paid its employees salary increases over a period of many years, as CMS has done here, the increases are sufficiently established to constitute the status quo. See, *e.g.*, *id.* at 508 (finding that step salary increments that had been utilized for 10 years were an established practice); *Lake Forest Professional Firefighters Union, IAFF, Local 1898*, 29 PERI ¶ 52 (ILRB State Panel 2012) (finding that employees had a reasonable expectation of receiving wage and step increases where they had regularly received the increases over a period of 12 years); *International Union of Operating Engineers*, 23 PERI ¶ 39 (20-year history of providing merit pay increases to eligible employees was an established practice that the employer was required to continue in order to maintain the status quo). Moreover, as a general rule, it is reasonable for employees to expect established practices to continue where, as here, the existing CBA expires before the parties finish negotiating a successor agreement. *Vienna School District*, 162 Ill. App. 3d at 508; *Wilkes-Barre Hospital Co. v. National Labor Relations Board*, 857 F.3d 364, 373 (D.C. Cir. 2017).

¶ 43 Under some circumstances, however, this general rule does not apply. In such cases, employees cannot reasonably expect all established practices to continue after the expiration of a CBA because alternative practices are sufficiently established to form a

status quo applicable to periods when the parties are between contracts. The question before us is whether the ILRB's conclusion that this is such a case was clearly erroneous.

¶ 44 In *Oakwood Teachers' Caucus, IEA-NEA*, 9 PERI ¶ 1090 (IELRB 1993), for example, the CBA between a teachers' union and a school district included provisions mandating salary increases based on both "horizontal" and "vertical" increments. The horizontal increments were based on teachers attaining higher levels of education, while the vertical increments were based on years of service. *Id.* The parties executed six CBAs before the dispute at issue arose. On all but two previous occasions, negotiations for a new agreement were complete before the beginning of a new school year. *Id.* On *both* of those occasions, the teachers received salary increases based on the horizontal increments at the beginning of the new school year, as provided in the expired CBA, but on both occasions, they did not receive the salary increases based on the vertical increments until the new CBA went into effect. *Id.* Beginning in 1984, the parties began including in each CBA a provision that any money or benefits due under the new agreement "will be payable within 30 calendar days of final approval by both parties." *Id.*

¶ 45 In 1992, negotiations for a new agreement once again continued past the beginning of the new school year, and the district again withheld payment of the vertical salary increases until the parties reached an agreement. *Id.* The union filed an unfair labor charge, alleging that the district failed to maintain the status quo by doing so. The Illinois Educational Labor Relations Board (IELRB) dismissed the charge. *Id.* The IELRB found that, based on the language of the contract and the parties' past practice and bargaining

20

history, the status quo required payment of the vertical increases only after execution of a new CBA. *Id.*

¶ 46    Similarly, in *Wilmette Education Ass'n, IEA-NEA*, 4 PERI ¶ 1077 (IELRB 1988), the CBA between a school district and its teachers' union called for incremental salary increases based on level of education and years of experience. These increases were a feature of every agreement the parties signed between 1973 and 1986, when the dispute at issue in the case arose. *Id.* Both types of increases were paid at the beginning of each new school year when a CBA was in place. However, on four previous occasions, the parties did not agree to a new contract before the beginning of the next school year after their previous agreement expired. *Id.* On all four of those occasions, the district withheld the salary increments until the new CBA was signed. Three times, the district did so unilaterally; the fourth time, it withheld the increases with the agreement of the union. *Id.* The IELRB found that even though the increases were paid at the beginning of the school year when a CBA was in effect, the "*consistent* past practice" of withholding the salary increments during contract hiatuses "formed the teachers' reasonable expectations and constituted the status quo." (Emphasis added.) *Id.*

¶ 47    In *Zion Education Ass'n, IEA-NEA*, 3 PERI ¶ 1091 (IELRB 1987), the IELRB reached a different result. There, the parties' CBAs contained similar provisions calling for teachers' salaries to be increased based upon both level of education and years of experience. *Id.* During the parties' 15-year bargaining relationship, they failed to agree to a new contract before the beginning of a new school year only twice prior to the dispute involved in the case. *Id.* During the first contract hiatus (in 1970), the parties agreed that

the teachers would continue to receive their step increases. During the second hiatus (in 1975), the district withheld the increases until a successor agreement was ratified. *Id.* The next time the parties failed to agree to a CBA before the beginning of a school year was 11 years later, in 1986. The district did not pay the salary increases, and the teachers' union filed an unfair labor charge. *Id.*

¶ 48    In determining whether the salary increases were part of the status quo, the IELRB first explained that the parties' expired 1983-84 CBA "gave the District's teachers a reasonable expectation that they would receive the salary increments *** with the first paycheck of the 1986-87 school year." *Id.* The Board then considered whether any factors existed that might alter this reasonable expectation. It found that there was nothing in the parties' bargaining history to alter the teachers' reasonable expectations. *Id.* As noted earlier, the parties' bargaining history included 15 years' worth of similar agreements. *Id.* The IELRB further found that nothing in the parties' past practices—including their practices during contract hiatus periods—negated the teachers' reasonable expectations. *Id.* It explained that the district's past practices during hiatus periods were "remote and inconsistent," with only one instance in which the increases were denied. *Id.* The IELRB thus concluded that the increases were a part of the status quo that the district was required to maintain. *Id.*

¶ 49    The rule we can discern from these cases is that the test for determining whether a practice is sufficiently established to constitute a part of the status quo during hiatuses between CBAs is essentially identical to the test for determining whether a practice forms a part of the status quo between the parties more generally. In this case, that means we

22

must consider whether, in light of the terms of the most recent CBA and the parties' past practices and bargaining history—particularly their past practices during contract hiatus periods—it was reasonable for employees to expect to receive their step increases after expiration of the CBA. See *Vienna School District*, 162 Ill. App. 3d at 509.

¶ 50　Here, as the ILRB found, the parties included step increases in every CBA dating back to 1974. The parties' decades-long history of agreeing to step increases coupled with the language of their most recent CBA was sufficient to give employees a reasonable expectation that they would continue to receive the step increases. For the same reasons, we find that it would have made it readily apparent to an objectively reasonable employer that this well-established practice was part of the status quo. See *id.* at 507.

¶ 51　This does not end our inquiry. As we have explained, we must also consider whether any established practices have emerged during the past hiatuses between contracts that would negate this reasonable expectation. We do not believe the record before us supports a finding that any such established practices exist for the simple reason that all three previous contractual hiatuses were handled differently. During the 1983 hiatus, the parties agreed to a temporary freeze of the step increases.[2] During the 2008 hiatus, the parties agreed that all three types of increases would continue. During the 2012 hiatus, which lasted through the summer of 2013, CMS unilaterally withheld the step increases and longevity increases but paid the increases associated with

---

[2]As explained earlier, AFSCME asserts that at least some of the employees did receive step increases during this period without an agreement.

23

semiautomatic promotions. Thus, there is no consistent practice sufficiently established to create a status quo specific to periods when the parties are between agreements.

¶ 52    The ILRB's conclusion to the contrary was flawed for three reasons. First, finding a status quo in the face of such inconsistent practices ignores the requirement that the status quo be based on "established practices." See, *e.g.*, *Thornton Fractional High School District*, 404 Ill. App. 3d at 764 (finding that two instances in which secretaries were offered positions based on seniority were insufficient to demonstrate an established practice of offering the positions based on seniority).

¶ 53    Second, the ILRB decision as written appeared to take into account the current hiatus as part of the relevant history it considered. We acknowledge that the ILRB does not rely on the current hiatus in its arguments on appeal. However, to the extent it relied upon CMS's practice of unilaterally withholding the step increases during the current contract hiatus, this is inappropriate bootstrapping. It is also worth noting that the practices followed by CMS during the 2012 and 2015 hiatuses are not even wholly consistent. In 2012, CMS withheld both the step increases and the longevity increases, while in the current hiatus, it is withholding only the step increases. Only the step increases are at issue in this appeal, but the difference illustrates part of the problem in finding the reasonable expectations of employees negated by the unilateral conduct of their employer during a single contract hiatus.

¶ 54    Third, accepting the ILRB's reasoning would eviscerate the requirement that an employer maintain the status quo during collective bargaining. It is undisputed that the only previous instance in which CMS withheld the step increases without AFSCME's

agreement was after the 2008-12 CBA expired. The ILRB found that employees could not reasonably expect anything different to occur in 2015 than what occurred in 2012. It reasoned that the reasonable expectations of employees must be based on this one period because it is the most "factually similar" period to the instant contract hiatus. Accepting this rationale would give employers the power to unilaterally alter the status quo by withholding a benefit during even one contract hiatus. Such a result would be untenable.

¶ 55 We reiterate that the general rule is that if a practice is sufficiently "established" to constitute the status quo, it is reasonable for employees to expect that practice to continue during hiatus periods between agreements. *Vienna School District*, 162 Ill. App. 3d at 508. This reasonable expectation is only negated in cases where a different practice becomes sufficiently established during periods between agreements to constitute a status quo applicable to those periods. The ILRB's conclusion that nonpayment of the step increases absent an agreement to pay them was sufficiently established to become the status quo for contract hiatus periods was clearly erroneous.

¶ 56 We next consider CMS's argument that section 21.5 of the Labor Relations Act (5 ILCS 315/21.5 (West 2014)) negates any obligation it might have to pay the step increases. This calls for us to construe the statute. Our primary goal in statutory construction is to discern and effectuate the intent of the legislature. The best indicator of this intent is the language of the statute to be construed, which should be given its plain and ordinary meaning. *City of Chicago v. Industrial Comm'n*, 331 Ill. App. 3d 402, 403 (2002). Because statutory construction is an issue of law, our review is *de novo*. *County of Cook*, 284 Ill. App. 3d at 152.

25

¶ 57 As discussed earlier, section 21.5 provides that a CBA between a state agency or department and the union representing its employees may not extend beyond June 30 of the year in which the Governor and other executive branch officers begin their terms. 5 ILCS 315/21.5(a) (West 2014). The CBA also may not require any salary increases after the day on which the new term of the Governor and other executive branch officers begins and before June 30 of that year. 5 ILCS 315/21.5(b) (West 2014). Any CBA that violates either of these prohibitions is "rendered null and void by operation of law." 5 ILCS 315/21.5(c) (West 2014). Here, as we also previously discussed, the ILRB found that the parties' most recent CBA violated subsection (b) by requiring step increases and longevity increases to be paid after the new Governor took office on January 12, 2015. The Board therefore found that the contract was null and void. However, the Board also concluded that the employer's duty to maintain the status quo is independent of the contract and, as such, the statute has no impact on CMS's obligation to pay the step increases if necessary to maintain the status quo. CMS argues that the ILRB erred in reaching this latter conclusion. We disagree.

¶ 58 There are two components to this argument. First, CMS correctly notes that because the CBA was rendered void by the statute, its contractual obligation to pay the step increases was likewise rendered null and void. CMS contends that by rendering this *contractual* obligation null and void, "Section 21.5(c) eliminates *any other legal obligation* to pay the step increases." (Emphasis added.) CMS cites no legal authority for this proposition, and we do not find it persuasive. As both AFSCME and the ILRB point out, the duty to preserve the status quo during contract negotiations does not depend on

the existence of a CBA; the obligation exists even during negotiations for an initial CBA. See, *e.g.*, *Metropolitan Alliance of Police, Grundy County Civilians, Chapter 693*, 32 PERI ¶ 26 (ILRB State Panel 2015) (considering whether an employer violated its obligation to maintain the status quo while the parties were in negotiations for their first CBA); *Lake Forest Professional Firefighters Union*, 29 PERI ¶ 52 (same). Nothing in the express language of section 21.5 addresses obligations that arise under other provisions of the Labor Relations Act.

¶ 59    Moreover, because the duty to preserve the status quo is part of an employer's statutory duty to bargain in good faith, we find that the broad interpretation of section 21.5 urged by CMS would put it into direct conflict with other provisions of the Labor Relations Act—specifically, sections 7 and 10(a)(4). See 5 ILCS 315/7, 10(a)(4) (West 2014). In construing a statutory provision, we must not read it in isolation. Rather, we must read it in conjunction with other provisions of the same act. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40 (2001). The construction urged by CMS does not comport with this basic tenet of statutory construction.

¶ 60    The second component to CMS's argument is that the public policy behind the enactment of section 21.5 requires us to accept its interpretation of the statute. This is so, CMS argues, because the statute was enacted to prevent one gubernatorial administration from saddling the next administration with financial obligations. However, as CMS acknowledges, the statute is clear and unambiguous. We may not read into a provision that is clear and unambiguous any terms or provisions that are not found in the statute. *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 38 (2009). We conclude that the ILRB

27

correctly found that section 21.5 has no effect on CMS's obligation to maintain the status quo.

¶ 61 Finally, we consider CMS's contention that we must affirm the ILRB's decision because the supreme court's recent decision in *State/CMS* negates its obligation to pay the increases absent a legislative appropriation of sufficient funds to do so. We note that CMS did not make this argument in the administrative proceedings. However, due to the timing of the supreme court's decision, we do not find the argument to be forfeited. The ALJ issued her recommended decision in this case on February 3, 2016. AFSCME filed its exceptions on March 16, and CMS filed its cross-exceptions on March 31. The ILRB considered the exceptions and issued a final written decision in May 2016. The supreme court issued its opinion in *State/CMS* on March 24, 2016. However, the court's mandate did not issue until June 27, 2016. By that time, the administrative proceedings in this case were complete. Under these circumstances, CMS could not have raised this argument before the ILRB. We will therefore address it.

¶ 62 *State/CMS* is one of several disputes between AFSCME and CMS arising from the state's budget crisis. That case involved the State's obligation to pay wage increases under the parties' 2008-12 CBA. The agreement called for general wage increases to go into effect on specified dates, including a 4% increase that was scheduled to go into effect on July 1, 2011. *State/CMS*, 2016 IL 118422, ¶ 4.

¶ 63 During 2010, AFSCME and CMS entered into a series of cost-savings agreements designed to avoid potential layoffs due to declining State revenue. *Id.* ¶¶ 6-7. In one of those agreements, AFSCME agreed that instead of receiving a 4% wage increase on July

28

1, 2011, employees would receive a 2% increase on that date, and they would receive another 2% increase on February 1, 2012. In exchange, CMS agreed that it would not close facilities or lay off employees during fiscal year 2012, which ran from July 1, 2011, to June 30, 2012. *Id.* ¶¶ 4 n.1, 7. However, the Governor's Office of Management and Budget determined that the legislature's appropriations bills did not include adequate funding for 14 of the State agencies to pay the 2% increase to their employees on July 1, 2011. *Id.* ¶ 8. CMS therefore announced that due to insufficient appropriations, it could not implement the July 1 wage increase for employees in those 14 agencies. *Id.* ¶ 9.

¶ 64    AFSCME initiated arbitration proceedings to enforce the provisions of the agreements mandating the wage increase. *Id.* ¶ 10. The arbitrator ruled in AFSCME's favor (*id.* ¶ 13), and CMS filed a petition to vacate the arbitration award (*id.* ¶ 14). The trial court affirmed the award with modifications not relevant here (*id.* ¶¶ 15-17), and CMS appealed its ruling (*id.* ¶ 18). The First District affirmed the arbitration award in its entirety (*id.* ¶ 20), but the supreme court reversed that ruling and vacated the award (*id.* ¶ 56).

¶ 65    In reaching the conclusion it did, the supreme court considered the effects of the appropriations clause of our state constitution (Ill. Const. 1970, art. VIII, § 2(b)) and section 21 of the Labor Relations Act (5 ILCS 315/21 (West 2012)) on the State's contractual obligation to pay the wage increases without adequate appropriations from the legislature. The appropriations clause gives the legislature exclusive power to appropriate funds for expenditures. *State/CMS*, 2016 IL 118422, ¶ 42 (citing Ill. Const. 1970, art. VIII, § 2(b), and *McDunn v. Williams*, 156 Ill. 2d 288, 308 (1993)). Section 21

29

of the Labor Relations Act provides that, "Subject to the appropriation power" of the legislature, public employees and the unions representing their employees "may negotiate multi-year collective bargaining agreements." 5 ILCS 315/21 (West 2014).

¶ 66    The supreme court began its analysis by observing that an arbitration award "is not enforceable if [it] contravenes paramount considerations of public policy." *State/CMS*, 2016 IL 118422, ¶ 41. The court explained that the public policy of this State "finds expression, first and foremost, in our state constitution" (*id.* ¶ 42), and that public policy is also shaped by legislation (*id.* ¶ 43).

¶ 67    The court went on to explain that the Labor Relations Act reflects an important public policy of granting public employees the freedom to organize and to collectively bargain over the terms and conditions of their employment. *Id.* ¶ 44 (citing 5 ILCS 315/2 (West 2012)). The court observed, however, that "This broad statement of public policy *** is tempered by section 21." *Id.* (citing 5 ILCS 315/21 (West 2012)). The court explained that the language in the statute making multiyear CBAs subject to the legislature's appropriations power is an important limitation because it "reinforces the public policy of this state under which the power to appropriate for the expenditure of public funds is unique" to the legislature. *Id.* ¶ 45. Applying these principles to the facts before it, the supreme court held that section 21 made any provision in a multiyear CBA mandating the payment of wage increases implicitly contingent on sufficient legislative appropriations. *Id.* ¶ 49.

¶ 68    We reiterate that this case turns not on the contractual obligation to pay the step increases but on the employer's obligation to maintain the status quo. We note that CMS

30

does not argue that section 21 itself is applicable here. We also note that the *State/CMS* court emphasized that the only issue it was deciding was whether contractual obligations in a nonexpired multiyear CBA were subject to sufficient appropriations from the legislature. The court found that it would be "ill-advised" to address any other questions. *Id.* ¶ 54. The court's emphasis on the "dominant public policy" of the appropriations clause indicates that the case might have broader application, however. See *id.* ¶ 56.

¶ 69    CMS argues that the holding in *State/CMS* applies here and requires us to affirm the ILRB's decision because "the facts upon which the supreme court based its opinion are the same facts upon which this appeal is based." We disagree.

¶ 70    CMS's argument is based on Illinois's protracted budget impasse, which was only recently resolved. After the previous state budget expired on July 1, 2015, the legislature and the Governor were unable to agree to a budget. As a result, the State was without a budget for approximately two full years. During that time, the legislature passed various stop-gap appropriations bills, which did not fully fund the government. The stop-gap bill in effect in December 2016, when CMS filed its brief in this appeal, did not appropriate any funds to pay the salaries of the State's employees. On July 6, 2017, the impasse ended when the legislature overrode the Governor's veto of its budget legislation.

¶ 71    When AFSCME filed its reply brief in this matter, however, the status of the State's budget impasse had not changed since CMS filed its brief a month earlier. AFSCME's arguments reflect this fact. In response to CMS's arguments, AFSCME first argued that *State/CMS* is wholly inapplicable because this case involves the enforcement of a statutory obligation rather than a contractual obligation. See *Jorgensen v.*

31

*Blagojevich*, 211 Ill. 2d 286, 314 (2004) (explaining that when " 'a statute *categorically commands* the performance of an act, so much money as is necessary to obey the command may be disbursed without any explicit appropriation' " (emphasis added) (quoting *Antle v. Tuchbreiter*, 414 Ill. 571, 581 (1953))). AFSCME further argued that because there was no way "to predict what the State budgetary situation will be" by the time the ILRB issues an order directing CMS to take action to remedy the unfair labor practice, "it would be premature for this court to act upon any speculation that appropriations may not exist at the time an enforceable order is entered in this case." We agree with AFSCME's second contention.

¶ 72    Although CMS argues that the facts of this case are identical to the facts relied upon by the supreme court in *State/CMS*, we believe there are crucial distinctions that make it premature for us to consider whether inadequate appropriations negate CMS's obligation to pay the step increases in order to maintain the status quo. As previously discussed, before the dispute at issue in *State/CMS* arose, the Office of Management and Budget analyzed the appropriations that were made to each affected agency. After conducting this analysis, it concluded that 14 of the agencies lacked sufficient funding to pay the wage increases mandated by the CBA as modified by the cost-savings agreement. *State/CMS*, 2016 IL 118422, ¶ 8. The case reached the circuit court on CMS's motion to vacate the arbitrator's award in July 2012, shortly after fiscal year 2012 ended, and came for trial in December 2012. By the time of trial, nine of those agencies determined that they had sufficient funds remaining from their fiscal year 2012 appropriations to pay the back wages that had been ordered by the arbitrator. Those agencies paid the back wages,

and the litigation continued with respect to the obligation of the remaining five agencies. See *id.* ¶¶ 14-15, 15 n.5, 17 n.6.

¶ 73    The facts underlying CMS's appropriations argument in this case are quite different. When CMS filed its brief in this case in December 2016, the State had been without a budget for 18 months. The stop-gap appropriations bill in effect at the time provided no appropriations for paying State employees, a situation that led to extensive litigation between these same parties. As AFSCME correctly points out, however, there was no way to predict what the budget situation would be by the time the proceedings in this case concluded. Stop-gap appropriations bills are by their very nature temporary. Moreover, as we have discussed, the State now does have a budget. We presume the budget includes appropriations to pay State employees. However, we do not know how much funding has been appropriated to each agency that employs AFSCME's members. We do not know what the ILRB will direct CMS to pay union members to remedy the unfair labor practice. Most importantly, we do not know whether the funds appropriated will be sufficient to cover any payment ordered by the ILRB.

¶ 74    In *State/CMS*, the supreme court held that "the arbitrator's award, which ordered immediate payment of the 2% wage increase *without regard to the existence of corresponding appropriations* by the General Assembly, violated *** public policy." (Emphasis added.) *Id.* ¶ 56. Here, CMS asks us to uphold a decision finding that it did not commit an unfair labor practice. In essence, it asks us to find that AFSCME and its members are entitled to no remedy on the assumption that there will not be sufficient appropriations from which to satisfy any obligation the ILRB might impose on CMS

33

when crafting an appropriate remedy. Even assuming the holding of *State/CMS* is applicable to cases involving the obligation to maintain the status quo, it would not require that result. For this reason, we agree with AFSCME that it would be premature for this court to determine what, if any, impact insufficient appropriations might have on its obligation to pay the step increases. We will therefore leave that question for a more appropriate case. See *id.* ¶ 54 (stating that it was "ill-advised" for the dissent in that case to address issues not presented by case before the court). We hold only that (1) the ILRB's finding that CMS did not commit an unfair labor practice was clearly erroneous, and (2) section 21.5 of the Labor Relations Act (5 ILCS 315/21.5 (West 2014)) does not negate CMS's obligation to pay the step increases.

¶ 75    For the foregoing reasons, we grant CMS's motions to take judicial notice; we deny CMS's motion for remand before considering the merits; and we reverse the decision of the ILRB; and we remand for further proceedings.

¶ 76    Motions to take judicial notice granted; motion for remand denied; administrative decision reversed; cause remanded for further proceedings.

2017 IL App (5th) 160229

NO. 5-16-0229

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 31, | ) ) ) | Petition for Review of an Order of the Illinois Labor Relations Board, |
| Petitioner, | ) ) | State Panel. |
| v. | ) ) | |
| THE ILLINOIS LABOR RELATIONS BOARD and THE STATE OF ILLINOIS DEPARTMENT OF CENTRAL MANAGEMENT SERVICES, | ) ) ) ) | No. S-CA-16-006 |
| Respondents. | ) ) | |

_____

**Opinion Filed:**          **November 6, 2017**
_____

**Justices:**          Honorable Melissa A. Chapman, J.

                       Honorable Richard P. Goldenhersh, J., and
                       Honorable Judy L. Cates, J.,
                       Concur
_____

**Attorneys**     Stephen A. Yokich, Josiah A. Groff, Dowd, Bloch, Bennett, Cervone,
**for**           Auerbach & Yokich, 8 South Michigan Avenue, 19th Floor, Chicago, IL
**Appellant**     60603
_____

**Attorneys**     Thomas S. Bradley, Jeffrey S. Fowler, Lawrence Jay Weiner, Special
**for**           Assistant Attorneys General, Laner Muchin, Ltd., 515 North State Street,
**Appellees**     Suite 2800, Chicago, IL 60654 (attorneys for Illinois Department of
                  Central Management Services); Lisa Madigan, Attorney General, State of
                  Illinois, David L. Franklin, Solicitor General, Frank H. Bieszczat,
                  Assistant Attorney General, 100 West Randolph Street, 12th Floor,
                  Chicago, IL 60601 (attorneys for Illinois Labor Relations Board)
_____